No. 01-445

IN THE SUPREME COURT OF THE STATE OF MONTANA

2003 MT 324

STATE OF MONTANA,

        Plaintiff and Respondent,

   v.

FARREN GENE GALPIN,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Twenty-First Judicial District,
                 In and For the County of Ravalli, Cause No. DC-00-50,
                 Honorable Jeffrey H. Langton, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            William F. Hooks, Attorney at Law, Helena, Montana

        For Respondent:

            Honorable Mike McGrath, Attorney General; Mark Mattioli,
            Assistant Attorney General, Helena, Montana

            George H. Corn, County Attorney; T. Geoffrey Mahar, Deputy
            County Attorney, Hamilton, Montana

Submitted on Briefs:   July 2, 2002

Decided:   November 25, 2003

Filed:

_____
                    Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     Farren Gene Galpin (Galpin) was charged in the Twenty-First Judicial District Court, Ravalli County, with possession of methamphetamine (two counts), possession of precursors (two counts), criminal endangerment (one count), and manufacture of dangerous drugs (two counts).  Galpin moved to dismiss both possession charges for improper venue, arguing that Sanders County was the proper venue for the possession of methamphetamine charges and Missoula County the proper venue for one of the counts of possession of precursors.  Galpin also moved to suppress evidence obtained from a search performed at the time of his arrest, arguing that the search exceeded the scope of the arrest warrant and any recognized exceptions.  The District Court denied both motions after hearing, and Galpin proceeded to trial by jury.  He was subsequently convicted of all charges except for one count of possession of methamphetamine, that charge having been dismissed by the court.  Galpin appeals the District Court's denial of his motions.  We affirm in part and reverse in part.

¶2     Galpin raises the following issues on appeal:

¶3     Did the District Court err in denying Galpin's motion to dismiss for improper venue?

¶4     Was sufficient evidence presented at trial from which the jury could determine that the offenses of criminal endangerment and production or manufacture of dangerous drugs were committed in Ravalli County?

¶5     Did the District Court err in denying Galpin's motion to suppress?

**FACTUAL AND PROCEDURAL BACKGROUND**

¶6    In the early part of March 2000, the Division of Criminal Investigation of the Montana Department of Justice (DCI) was contacted by a State of Washington detective regarding an outstanding warrant for the arrest of Farren G. Galpin. According to the detective, Galpin's arrest was sought in Washington for failing to appear in a case in which he was charged with criminal production or manufacture of dangerous drugs. The detective had received reliable information that Galpin was hiding in Montana and believed to be manufacturing methamphetamine. Accordingly, DCI commenced an investigation to determine Galpin's whereabouts.

¶7    On March 2, 2000, Mike Heaney (Heaney), a DCI agent, interviewed Kimberly Vert (Vert) at her mobile home in Stevensville, Montana, Ravalli County. Vert was Galpin's former girlfriend and the two had lived together in Vert's mobile home in Missoula County for several months before moving the home to Stevensville in August 1999. Once in Stevensville, Galpin resided with Vert on an intermittent basis. Although the couple's relationship had "deteriorated" by that time to friendship, they maintained frequent phone contact and Galpin continued to store many of his personal belongings at Vert's residence.

¶8    During Heaney's visit with Vert on March 2, 2000, Vert consented to a search of her home. While searching the back bedroom, DCI agents discovered a methamphetamine lab which Vert indicated Galpin used on several occasions to manufacture methamphetamine. Vert also told Heaney about two storage units–one in Missoula County and one in Ravalli County–in which Galpin allegedly stored methamphetamine lab equipment. Vert informed

3

Heaney that Galpin might be staying at a residence occupied by Lance Grazier (Grazier) and Althea Liberty (Liberty) located just outside Dixon, Montana, in Sanders County. She agreed to wear a body wire, an electronic transmitting device, into the residence to determine whether Galpin was present.

¶9 At approximately 9:30 p.m. that evening, equipped with the body wire provided by DCI, Vert entered the small Dixon residence. Grazier, Liberty, and Galpin were present. DCI agents listened from a vehicle outside as Vert engaged Galpin in a brief discussion concerning the storage unit in Ravalli County. When Vert spoke to Galpin, she used his first name and Galpin responded. Vert then exited the residence and confirmed that Galpin was inside.

¶10 In the early morning hours of March 3, 2000, Heaney sought and received a warrant authorizing DCI to search for and arrest Galpin at the Dixon residence. In his application, Heaney noted that Galpin's presence at the residence had been confirmed by Vert, who had provided information the previous day leading to the discovery of a methamphetamine lab.

¶11 At approximately 4:30 a.m. on March 3, 2000, Ken Poteet (Poteet), the regional agent in charge of the Missoula, Montana, region for DCI, along with a team of specially trained agents, executed the search warrant at the Dixon residence. Grazier, for whom an arrest warrant from Sanders County had been issued on poaching charges, answered the door, and was handcuffed and placed on the small living room floor. Agents discovered Galpin sleeping on the living room couch, wearing only his pants, with a button-down shirt draped over the couch. Within seconds of their entry, agents forced Galpin to his knees on the living

4

room floor and handcuffed him. They then placed his shirt over his shoulders and performed a pat-down search of Galpin's person, discovering two plastic baggies of methamphetamine, which they seized.

¶12 Galpin remained on the living room floor while agents secured the rest of the premises, which were also occupied by Liberty. In the process of securing the residence, Agent Poteet discovered a duffel bag and coat which Galpin identified as belonging to him. Although testimony presented at the suppression hearing conflicted as to the precise location of Galpin's coat and duffel bag, the District Court determined these possessions were located on a hutch approximately four to six feet from the couch where Galpin slept, with his coat either lying on top of the duffel bag or hanging just above it.

¶13 In the process of handcuffing Galpin, agents had placed him near the end of the couch closest to the hutch, putting Galpin in even closer proximity to his belongings. Knowing chemicals used to manufacture methamphetamine to be easily mobile, highly toxic, and even explosive when mishandled, Agent Poteet performed a precautionary search of the duffel bag. He then searched Galpin's coat, discovering two sets of keys which he seized as possible evidence of the storage facilities in Missoula and Ravalli Counties. Galpin and his belongings were subsequently transported to the detention center where officers performed a search of his duffel bag pursuant to a separately issued search warrant.

¶14 Later that same morning, also pursuant to separately issued search warrants, DCI agents searched the storage facilities in Missoula and Ravalli Counties. As Poteet anticipated, the set of keys seized earlier that morning contained one key fitting padlocks to

both storage units. Inside the Missoula County unit, agents discovered several mason jars filled with a suspicious looking liquid. In one jar, the liquid had separated into two layers, with a clear liquid on top. On another, the word "waste" was written. An analysis of samples obtained from the jars revealed traces of methamphetamine, ephedrine, pseudoephedrine, red phosphorous, and red iodine.

¶15 On April 17, 2000, the State of Montana filed an Information in the Twenty-First Judicial District Court, Ravalli County, charging Galpin with one count of criminal production or manufacture of methamphetamine (in Ravalli County), two counts of criminal possession of precursors to methamphetamine (in Ravalli and Missoula Counties), and three counts of criminal endangerment (in Ravalli County). The State also charged Galpin with one count of criminal possession of methamphetamine in Ravalli County. However, at trial, the State conceded that charging Galpin with this offense in Ravalli County was due to a typographical error and that the Information should have charged the offense as occurring in Sanders County. In response to the State's oversight, the District Court amended the Information as to form, pursuant to § 46-11-205(3), MCA (1999), so that it reflected Sanders County as the place where the offense allegedly occurred.

¶16 From the outset, Galpin had proceeded upon the assumption that the State's Information, charging him with possession of methamphetamine in Ravalli County, was simply an oversight and should have identified the offense as occurring in Sanders County. Shortly after the State filed its Information, Galpin moved to dismiss the charges of possession of methamphetamine in Sanders County (inadvertently alleged in the Information

6

as Ravalli County) and possession of precursors in Missoula County for improper venue, arguing that the State failed to prove these offenses, or any element thereof, occurred in Ravalli County.

¶17     At the same time, Galpin moved to suppress evidence obtained from the search and seizure of his coat and duffel bag.  Although conceding the agents were authorized to search and seize the methamphetamine found on his person, Galpin argued the warrantless search of his coat and duffel bag was unlawful, thereby violating his constitutional rights to be free from unlawful searches and seizures.

¶18     The District Court denied both motions after hearing, concluding that Ravalli County was the proper venue for all charges and that the search of Galpin's coat and duffel bag was a lawful search incident to arrest.  In the alternative, the court found the search of Galpin's coat and duffel bag was lawful by virtue of the agent's having probable cause to conduct the search, and by the existence of exigent circumstances which made it impracticable to obtain a search warrant.

¶19     On October 17, 2000, the State filed an Amended Information, adding to the charges one count of criminal production or manufacture of methamphetamine in Missoula County, one count of criminal possession of methamphetamine in Missoula County, and dismissing two counts of criminal endangerment.  At trial, Galpin orally renewed his motion to dismiss for improper venue, which the court denied.  However, upon Galpin's motion for a directed verdict, the court dismissed the charge of criminal possession of methamphetamine in Missoula County, finding insufficient evidence to support the charge.  Galpin was

7

subsequently convicted by jury on all remaining counts. He now appeals the District Court's denial of his motions to dismiss for improper venue and to suppress, and additionally argues the State failed to satisfy its burden of proof at trial that venue for the criminal endangerment charge and production of dangerous drugs offense was proper in Ravalli County.

## DISCUSSION

**¶20 Did the District Court err in denying Galpin's motion to dismiss for improper venue?**

¶21 Galpin argues the District Court erred in denying his pre-trial motion to dismiss the charges of criminal possession of methamphetamine (Sanders County) and possession of precursors (Missoula County), asserting there was no evidence before the District Court proving the alleged offenses were committed in Ravalli County. The State responds that venue in Ravalli County was proper pursuant to § 46-3-112, MCA, which allows a defendant to be charged in any county in which any of the criminal acts occurred when several acts form the basis for a single offense.

¶22 The grant or denial of a motion to dismiss for improper venue in a criminal case is a question of law which we review *de novo*. *State v. Diesen*, 2000 MT 1, ¶ 11, 297 Mont. 459, ¶ 11, 992 P.2d 1287, ¶ 11. Our standard of review of a conclusion of law being plenary, this Court reviews a district court's denial of a motion to dismiss to determine whether the court's conclusion is correct. *Diesen*, ¶ 11; *State v. Cooney* (1995), 271 Mont. 42, 45, 894 P.2d 303, 305.

8

¶23 Article II, Section 24, of the Montana Constitution provides that "in all criminal prosecutions, the accused shall have the right to . . . a speedy public trial by an impartial jury *of the county or district in which the offense is alleged to have been committed . . . .*" (Emphasis added.) In Montana, it is firmly established that venue, although not an element of the crime, is a "jurisdictional fact" that must be established at trial beyond a reasonable doubt. *State v. Price*, 2002 MT 229, ¶ 11, 311 Mont. 439, ¶ 11, 57 P.3d 42, ¶ 11; *State v. Johnson* (1993), 257 Mont. 157, 161, 848 P.2d 496, 498. However, this Court has recognized that direct evidence that an offense was committed in a particular county is not required to prove venue. *State v. Keeland* (1909), 39 Mont. 506, 513, 104 P. 513, 516 (holding that circumstantial evidence may be sufficient to prove venue); *Johnson*, 257 Mont. at 161, 848 P.2d at 498 (holding that testimony from three witnesses regarding certain portion of a highway was sufficient to establish venue in Dawson County); and *State v. Jackson* (1979), 180 Mont. 195, 200, 589 P.2d 1009, 1013 (concluding that testimony that an act occurred in Billings, Montana, was sufficient to establish venue in Yellowstone County, Montana).

¶24 Here, the initial Information alleged one count of criminal possession of precursors in Missoula County and one count of criminal possession of methamphetamine in Sanders County. For purposes of a pretrial motion to dismiss for improper venue, generally it will suffice if the charging documents, which are supported by probable cause, assert that the court has jurisdiction of the subject matter and that the offense was committed within the territory encompassed by the court. *See State v. Andrews* (Ohio App. 10th Dist. 2002), 772

9

N.E.2d 167, 169. However, in this case, the Information does not allege these offenses were committed in Ravalli County, where the Information was filed, but in Missoula and Sanders Counties.

¶25     As pointed out by the State, charges in criminal prosecutions generally must be filed in the county where the offense was allegedly committed. Section 46-3-110(1), MCA. However, Montana law makes provision for those situations where criminal offenses occur in multiple counties. Section 46-3-112(1), MCA, provides:

> Except as provided in 46-3-110(2), if two or more acts are requisite to the commission of an offense or if two or more acts are committed in furtherance of a common scheme, the charge may be filed in any county in which any of the acts or offenses occurred.

Thus, venue is proper in any county in which the evidence reveals a requisite act of the offense was committed, or where an offense in furtherance of a common scheme of offenses occurred.

¶26     Section 45-9-107(1), MCA, provides that "[a] person commits the offense of criminal possession of precursors to dangerous drugs if the person possesses any material, compound, mixture, or preparation that contains any combination of . . . [materials identified in § 45-9-107(1), MCA, including ephedrine, pseudoephedrine, anhydrous ammonia, or red phosphorus] with intent to manufacture dangerous drugs." As set forth in the Compiler's Comments to § 45-9-107, MCA, "[c]onviction under this section requires proof of (1) possession, as that term is defined in 45-2-101 of (2) any of the named combinations of chemicals, as well as (3) intent to manufacture." For purposes of establishing venue in

10

Ravalli County pursuant to § 46-3-112(1), MCA, the State must show that an act requisite to any element of this offense occurred in Ravalli County.

¶27     In the county attorney's affidavit supporting the State's motion for leave to file an Information, the State alleged that prior to Galpin's arrest, Kimberly Vert, Galpin's former girlfriend, led DCI agents to a methamphetamine lab in her Ravalli County residence. According to Vert, the lab belonged to Galpin, who had used it to manufacture methamphetamine in her home while her children were present. Vert also advised officers that Galpin maintained storage units in Missoula and Ravalli Counties, allegedly housing clandestine methamphetamine labs. With Vert's assistance, DCI located and obtained a search warrant for Galpin at the Sanders County residence of Lance Grazier and Althea Liberty near Dixon, Montana. Upon arresting Galpin, agents discovered two plastic baggies of methamphetamine in Galpin's clothing and a set of keys in his jacket, later found to fit the padlocks to the storage facilities in Missoula and Ravalli Counties. When agents searched the storage units pursuant to separately issued search warrants, they discovered evidence of methamphetamine precursors, including Red Devil Lye, red crystals, toluene, lacquer thinner, and pseudoephedrine.

¶28     At the September 5, 2000 hearing, Agent Poteet additionally testified that, prior to Galpin's arrest, DCI had received information from Washington authorities that Galpin's arrest was sought in the State of Washington for failing to appear in a case in which he was charged with criminal production of dangerous drugs. According to Agent Poteet, Galpin was believed to be hiding in Montana and was possibly manufacturing methamphetamine

11

in several counties throughout the western region of the state. Agent Poteet explained that, with Kimberly Vert's assistance, DCI located Galpin in Sanders County and learned that he maintained storage facilities in Missoula and Ravalli Counties. Upon arresting Galpin, Agent Poteet discovered two plastic baggies of methamphetamine and a set of keys later found to fit the padlocks to both storage facilities.

¶29 Section 45-2-101(58), MCA, states, "possession is the knowing control of anything for a sufficient time to be able to terminate control." In *State v. Meader* (1979), 184 Mont. 32, 43, 601 P.2d 386, 392, we held that possession of contraband may be imputed when it is found in a place which is immediately and exclusively accessible to the accused and subject to his dominion and control. In *State v. Caekaert*, 1999 MT 147, ¶ 10, 295 Mont. 42, ¶ 10, 983 P.2d 332, ¶ 10, we cited *Meader*, noting that "[c]onstructive possession occurs when the accused maintains control or a right to control the contraband . . . ." (Citation omitted.) Furthermore, "the possession of keys to a locked area is probative of constructive possession of items within that area." *Caekaert*, ¶ 12.

¶30 Here, Galpin's possession of the keys to the storage facilities in both Missoula and Ravalli Counties is probative of his exclusive possession of the contents contained therein. Although no direct testimony was presented at the hearing indicating that the possession of precursors offense was committed in Ravalli County, Agent Poteet's testimony and the affidavit filed in support of the State's Information established that Galpin traveled in and out of Ravalli County, remaining in possession of the storage facilities' contents as he did

12

so. Furthermore, this Court has previously held that direct testimony is not required to establish venue. *Jackson*, 180 Mont. at 200, 589 P.2d at 1013. In *Jackson*, we noted that:

> No positive testimony that the violation occurred at a specific place is required. It is sufficient if it can be concluded from the evidence as a whole that the act was committed in the county where the indictment is found. Circumstantial evidence may be and often is stronger and more convincing than direct evidence. . . . If, from the facts and evidence, the only rational conclusion which can be drawn is that the crime was committed in the state and county alleged, the proof is sufficient.

*Jackson*, 180 Mont. at 200, 589 P.2d at 1013 (citing *State v. Campbell* (1972), 160 Mont. 111, 118, 500 P.2d 801). The allegations contained in the April 17, 2000 Information and the testimony presented at the September 5, 2000 hearing was sufficient to establish Ravalli County as a proper venue for prosecution of the possession of precursors offense. Thus, the motion to dismiss was properly denied.

¶31 Galpin next takes issue with the District Court's denial of his motion to dismiss the possession of methamphetamine charge (Sanders County) for improper venue. As set forth at § 45-9-102(1), MCA, "[a] person commits the offense of criminal possession of dangerous drugs if he possesses any dangerous drug, as defined in 50-32-101." As defined, methamphetamine is a dangerous drug. *See* §§ 50-32-101(6) and 50-32-222, MCA.

¶32 At the time of Galpin's arrest on March 3, 2000, DCI agents discovered two plastic baggies of methamphetamine on Galpin's person. While Galpin concedes the agents' search was lawful, he argues that the proper venue for the charge was in Sanders, not Ravalli, County. We agree.

13

¶33 Although § 46-3-112, MCA, allows an accused to be tried in any county in which any element of the crime occurred, it still requires that some act material and essential to the crime, and requisite to its consummation occur in each county before the provisions of the statute become applicable. *State v. Preite* (1977), 172 Mont. 318, 324, 564 P.2d 598, 601. Here, Galpin correctly notes that the crime of possession of methamphetamine has but one requisite act–possession of the drug itself. Although it defies logic that one can be engaged in the production of methamphetamine and not also be in possession, neither the State's Information nor the testimony presented at hearing established that Galpin actually possessed manufactured methamphetamine anywhere but Sanders County. Furthermore, at trial, the State conceded it mistakenly charged Galpin with this offense in Ravalli County. Accordingly, Ravalli County was not a proper venue for prosecution of the possession of dangerous drugs charge. We therefore reverse the District Court's denial of the motion to dismiss this charge, and, accordingly, Galpin's conviction of that offense.

¶34 **Was sufficient evidence presented at trial from which the jury could determine that the offenses of production or manufacture of dangerous drugs and criminal endangerment were committed in Ravalli County?**

¶35 Viewing the evidence in a light most favorable to the prevailing party in district court, we review the sufficiency of the evidence to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *State v. Duffy*, 2000 MT 186, ¶ 50, 300 Mont. 381, ¶ 50, 6 P.3d 453, ¶ 50.

¶36 Pursuant to § 45-9-110(1), MCA, "[a] person commits the offense of criminal production or manufacture of dangerous drugs if the person knowingly or purposely

14

produces, manufactures, prepares, cultivates, compounds, or processes a dangerous drug, as defined in 50-32-101." Thus, the components of this offense include (1) knowingly or purposely, (2) manufacturing, preparing, cultivating, compounding, or processing, (3) a dangerous drug. Because the offense consists of more than one requisite act, we examine the record to determine whether a rational trier of fact could have reasonably concluded that any of the acts requisite to this offense occurred in Ravalli County.

¶37 Prior to commencing its investigation in March 2000, DCI received information from Washington authorities that Galpin was a transient methamphetamine manufacturer whose arrest was sought in the State of Washington for failing to appear in a case in which he was charged with manufacturing dangerous drugs. When Agent Heaney interviewed Vert at her Ravalli County residence on March 2, 2000, she confirmed that Galpin was engaged in an ongoing operation of manufacturing methamphetamine. At trial, Vert testified to several instances in which she witnessed Galpin producing the drug, both at her Missoula and Ravalli County residences, as well as in motel rooms throughout Missoula County. Vert additionally testified that Galpin stored recipes for making methamphetamine at his storage unit in Ravalli County and often transported equipment needed to manufacture methamphetamine, such as mason jars and barrels, through Ravalli County. During their search of the storage facilities in Missoula and Ravalli Counties, agents indeed uncovered recipes for manufacturing methamphetamine, mason jars containing mysterious liquids, various receipts for products containing ephedrine, and empty boxes of Sudafed.

¶38 The jury also heard testimony from Vert's daughters, S.C. and K.C., who at the time of trial were eleven and twelve years old respectively. Both girls testified that Galpin lived

15

with their mother at the residences in Missoula and Ravalli Counties and recalled a strange turpentine-like odor that seemed to come from the back bedroom when Galpin was present. S.C. additionally recalled seeing cans of toluene in the back of Galpin's vehicle when Galpin was present at the Ravalli County residence. According to the State's forensic scientist, Annalivia Harris, toluene is an organic solvent that can be used to extract or purify methamphetamine from the reaction mixture.

¶39 In Harris's expert opinion, methamphetamine had been manufactured at both the Missoula County and Ravalli County storage facilities. An analysis of the samples obtained from the storage facilities revealed substances consistent with methamphetamine, as well as several precursors to methamphetamine, including ephedrine and pseudoephedrine. In one sample, Harris identified red phosphorus and red iodine, significant when found together because it suggests that methamphetamine has been produced.

¶40 From this evidence, we conclude Galpin was engaged in an ongoing operation of manufacturing methamphetamine throughout Missoula and Ravalli Counties. At trial, the State presented sufficient evidence that Galpin knowingly or purposely prepared, processed, or manufactured the drug as he traveled between Missoula and Ravalli Counties. It is irrelevant that the final consummation of the offense may have ultimately occurred in another county. *See* § 46-3-112, MCA, Commn. Cmt. Accordingly, a rational trier of fact could have found that at least one of the requisite elements of § 45-9-110, MCA, occurred in Ravalli County, thus making it a proper venue in Galpin's prosecution pursuant to § 46-3-112(1), MCA.

¶41 Further, as argued by the State, the record demonstrates that Galpin's activities in Missoula and Ravalli Counties were part of a common scheme to manufacture methamphetamine. "Common scheme" is defined in § 45-2-101(7), MCA, as "a series of acts or omissions motivated by a purpose to accomplish a single criminal objective *or by a common purpose or plan that results in the repeated commission of the same offense . . . .*" (Emphasis added.) Here, the evidence presented at trial showed that many of Galpin's activities were motivated by a common objective to maintain an ongoing methamphetamine manufacturing operation in which he repeatedly committed the same offense.

¶42 Key to the success of Galpin's operation was his use of individuals like Kimberly Vert, who provided Galpin a place to live, a location to manufacture the drug, and assistance in obtaining the requisite precursors. Vert and another woman were responsible for the initial rental of the storage facilities in Missoula and Ravalli Counties and dutifully purchased the chemicals necessary to make methamphetamine when instructed to do so by Galpin. In addition, Vert frequently allowed Galpin to manufacture methamphetamine at her mobile home residence, both in Missoula and Ravalli Counties, and assisted him in washing and transporting the mason jars and barrels used in manufacturing the drug.

¶43 The evidence produced at trial additionally indicated that Galpin took great care in maintaining anonymity. According to Vert, Galpin traveled in vehicles registered to other individuals, always paid for things in cash, and used his twin brother's driver's license for identification purposes. In support of her testimony, the State produced evidence of bills of sales to vehicles identified as belonging to Galpin, made out in the names of other individuals, as well as an expired driver's license issued to Darren Galpin, Galpin's twin

17

brother, which was discovered in Galpin's duffel bag following his arrest and transportation to the detention center.

¶44    Further, Galpin concealed his whereabouts by frequently moving between counties. When not with Vert in Ravalli County or with his girlfriend in Missoula County, he stayed at the residence of Lance Grazier and Althea Liberty in Sanders County. Evidence produced at trial showed that as Galpin traveled between Missoula and Ravalli Counties, he continued to manufacture methamphetamine at different locations within these counties. Just as agents discovered substances consistent with the production of methamphetamine at the Missoula County storage facility, they also discovered evidence of methamphetamine production at the Ravalli County facility, including a tea strainer bearing a white residue, and a red powder consistent with red iodine. In the expert opinion of Annalivia Harris, methamphetamine had been manufactured at both storage facilities.

¶45    We conclude, from this evidence, that Galpin was "motivated by a common purpose or plan," which resulted "in the repeated commission of the same offense." Galpin's activities, from possessing precursors to preparing the drug, were performed in furtherance of a common objective to manufacture methamphetamine. The resulting commission of offenses in Missoula and Ravalli Counties are therefore interrelated and sequential, both requiring overlapping proof of criminal acts and mental state. Because Galpin committed one or more acts in Ravalli County in furtherance of this common scheme, venue was proper in Ravalli County.

¶46    Finally, Galpin takes issue with the sufficiency of evidence presented in support of venue for the criminal endangerment charge in Ravalli County, arguing that the State failed

to satisfy its burden of proof that the alleged criminal endangerment occurred in Ravalli County. According to Galpin, the evidence on the record is insufficient to determine whether the offense occurred in Missoula County, prior to Vert's move to Stevensville, or in Ravalli County, following her move.

¶47 At trial, Vert testified that Galpin manufactured methamphetamine at her Ravalli County residence in the presence of her children on at least three separate occasions. In one instance, Vert returned home with her children to discover Galpin in the process of manufacturing the drug. On several other occasions, Vert testified that Galpin manufactured methamphetamine while the children slept at the Ravalli County residence.

¶48 Both S.C. and K.C. recalled several instances in which they smelled a strange turpentine-like odor emanating from the back bedroom when Galpin was present. On one such occasion, the odor was so powerful that it made K.C. feel dizzy and gave S.C. a headache. S.C. additionally testified to the collection of mason jars located on Galpin's side of the back bedroom and recalled Galpin stapling matchbooks together to form a long string. According to Vert, Galpin frequently obtained the red phosphorous necessary to produce methamphetamine by removing the strikers from matches.

¶49 Viewing this evidence in a light most favorable to the prosecution, a rational trier of fact could have found, and did find here, the requisite elements of criminal endangerment beyond a reasonable doubt. Because venue is proper in the county in which the offense occurred, Ravalli County was a proper venue for prosecution of the criminal endangerment charge.

¶50 **Did the District Court err in denying Galpin's motion to suppress?**

19

¶51    Galpin charges that the search of his coat and duffel bag on March 3, 2000, leading to the discovery of a key fitting the padlocks to both storage facilities, exceeded the scope of a search incident to a lawful arrest, thereby violating his right to be free from unreasonable searches and seizures, guaranteed under the Fourth Amendment of the United States Constitution and Article II, Sections 10 and 11, of the Montana Constitution. Accordingly, he maintains the District Court erred in denying his motion to suppress.

¶52    We review a district court's denial of a motion to suppress to determine whether the court's findings are clearly erroneous, and whether those findings were correctly applied as a matter of law.  *State v. Elison*, 2000 MT 288, ¶ 12, 302 Mont. 228, ¶ 12, 14 P.3d 456, ¶ 12.

¶53    Here, the District Court found that the coat and duffel bag were within Galpin's immediate presence, or "grab area," and that a potential existed for Galpin, although handcuffed, to reach his coat and remove a weapon or eliminate evidence.  The court therefore concluded the search was justified as a warrantless search incident to a lawful arrest.  We agree with the District Court.

¶54    Under Montana law, warrantless searches are *per se* unreasonable.  *State v. Hardaway*, 2001 MT 252, ¶ 36, 307 Mont. 139, ¶ 36, 36 P.3d 900, ¶ 36.  However, when a lawful arrest is made, it is permissible for law enforcement to reasonably search the person arrested and the area immediately within his reach in order to locate any weapons the person might use or any evidence that might otherwise be destroyed.  *State v. Olson*, 2002 MT 211, ¶ 17, 311 Mont. 270, ¶ 17, 55 P.3d 935, ¶ 17; *see also Chimel v. California* (1969), 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685, 694; § 46-5-102, MCA.  Such a search

20

generally must be limited to the immediate locale of the arrest. *Chimel,* 395 U.S. at 763, 89 S.Ct. at 2040, 23 L.Ed.2d at 694; *see also Maryland v. Buie* (1990), 494 U.S. 325, 333, 110 S.Ct. 1093, 1097, 108 L.Ed.2d 276, 285. In Montana, the scope of a lawful search incident to arrest is codified at § 46-5-102, MCA, providing that when a law enforcement officer effects a lawful arrest, it is reasonable for the officer to search the arrestee and the *area within the arrestee's immediate presence* in order to (1) protect the officer from attack, (2) prevent the arrestee from escaping, (3) discover and seize fruits of the crime, or (4) discover and seize any people or items which may have been used in committing–or constitute evidence of–a crime. Thus, the scope of a warrantless search incident to a lawful arrest under § 46-5-102, MCA, must be commensurate with the underlying purposes of preventing the arrestee from using any weapons he or she may have, escaping, or destroying any incriminating evidence in his or her possession. *Hardaway*, ¶ 57. Because subsections (1) through (3) of § 46-5-102, MCA, inherently anticipate exigent circumstances, such as police protection, escape, or imminent destruction of evidence, a separate showing of exigency is unnecessary. *Hardaway*, ¶ 57. However, to the extent a warrantless search incident to a lawful arrest is performed under § 46-5-102(4), MCA, the State must demonstrate specific and articulable exigent circumstances to justify and render lawful a search incident to arrest. *Hardaway*, ¶ 57.

¶55     Here, it is uncontroverted Galpin was lawfully arrested. According to the testimony presented by the State at the September 5, 2000 suppression hearing, Galpin's coat and duffel bag were located approximately four to six feet from the couch where Galpin slept. In the

21

small confines of the living room of the Dixon residence, Galpin was handcuffed and placed on his knees near the end of the couch closest to the hutch, putting him in even closer proximity to his coat and duffel bag. Despite the handcuffs, the District Court found that "a man leaning his body and reaching, even with his hands in cuffs, could potentially reach articles within that range." In the darkness of the early morning hours of March 3, 2000, it would have been readily possible for Galpin to access a weapon hidden among his possessions or discreetly eliminate evidence. Thus, we conclude the search of Galpin's coat and duffel bag was permissible pursuant to § 46-5-102(1) and (3), MCA, both as a means of protecting agents from attack, as well as discovering and seizing fruits of the crime.

¶56    The search of Galpin's coat and duffel bag was additionally justified pursuant to § 46-5-102(4), MCA, due to exigent circumstances present at the time of Galpin's arrest. "Exigent circumstances" are those which would cause a reasonable person to believe that prompt action is necessary to prevent physical harm to an officer or other person, the destruction of relevant evidence, the escape of a suspect, or some other consequence improperly frustrating law enforcement efforts. *State v. Wakeford,* 1998 MT 16, ¶ 24, 287 Mont. 220, ¶ 24, 953 P.2d 1065, ¶ 24. In this case, agents had discovered methamphetamine on Galpin's person following a pat-down search and a methamphetamine lab stored in a similar duffel bag at Kimberly Vert's residence the previous day. Consequently, they reasonably suspected Galpin's duffel bag contained equipment and chemicals used in methamphetamine production. Knowing such chemicals to be highly toxic and potentially explosive when mishandled, agents were justified in their precautionary search of Galpin's

duffel bag. Furthermore, the seizure of Galpin's coat and, in particular, the keys found inside, was justified in light of the fact that Althea Liberty, who was not arrested, would remain behind at the house upon the agents' departure with Galpin, thereby subjecting the evidence to Liberty's disposition and possible destruction.

¶57 We therefore conclude, from the facts and circumstances present at the time of Galpin's arrest, that the search of Galpin's coat and the cursory search of his duffel bag was commensurate with the purposes set forth at § 46-5-102(1), (3), and (4), MCA, as it was supported by the existence of exigent circumstances and conducted for the purposes of protecting the agents from attack, discovering and seizing the fruits of the crime, as well as discovering and seizing articles which may have been used in the commission of the crime or constitute evidence thereof. Accordingly, the District Court did not err in denying Galpin's motion to suppress evidence obtained as a result of the search.

¶58 Affirmed in part and reversed in part.


/S/ JIM RICE

We concur:

/S/ KARLA M. GRAY
/S/ JIM REGNIER
/S/ W. WILLIAM LEAPHART
/S/ PATRICIA COTTER
/S/ JAMES C. NELSON

23