DA 07-0259

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2008 MT 159

STATE OF MONTANA,

        Plaintiff and Appellee,

  v.

JAMES GLENN DICKINSON,

        Defendant and Appellant.

APPEAL FROM:    District Court of the Fourth Judicial District,
In and For the County of Missoula, Cause No. DC 2006-142
Honorable Douglas G. Harkin, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

            Jim Wheelis, Chief Appellate Defender, Lisa S. Korchinski, Assistant
            Appellate Defender, Helena, Montana

        For Appellee:

            Hon. Mike McGrath, Montana Attorney General, Mark Mattioli, Assistant
            Attorney General, Kelly Hubbard, Legal Intern, Helena, Montana

            Fred Van Valkenburg, Missoula County Attorney, Jennifer Clark, Deputy
            County Attorney, Missoula, Montana

Submitted on Briefs:  January 23, 2008

Decided:  May 6, 2008

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1   In March 2006 James Glenn Dickinson (Dickinson) was charged by Information with multiple felony and misdemeanor offenses.  In May 2006 he moved to suppress certain evidence obtained pursuant to a search warrant.  After a hearing on the motion, the Fourth Judicial District Court for Missoula County denied the motion.  Dickinson appeals.  We affirm.

## ISSUE

¶2   The question presented is whether the District Court erred in denying Dickinson's motion to suppress evidence.

## FACTUAL AND PROCEDURAL BACKGROUND

¶3   On February 25, 2006, Missoula City Police Officers Hoffman and Fiscus, following a tip, arrived at a Missoula motel to investigate the theft of an all-terrain vehicle (ATV).  The officers approached the motel room identified in the tip and noticed through the open curtains the presence of a male and a female, later identified as Robert Phillips and Crystal Orman.  Hoffman knocked on the door and made eye contact with Phillips through the window.  Phillips partially opened the door at which time Hoffman attempted to open the door wider but met with mild resistance.  When Hoffman asked what was behind the door, Phillips responded that it was the garbage can.  Through the doorjamb, Hoffman observed a garbage can and saw a loaded black, semi-automatic handgun lying atop some garbage in the can.  Hoffman requested permission to enter but Phillips and Orman declined the request saying that a third person, a male named "James," (later identified as Dickinson) was in the shower.

2

¶4     The officers asked Phillips and Orman to exit the room.  They asked if either had information regarding the stolen ATV.  Both denied any such knowledge.  After further questioning, the officers allowed Phillips to retrieve his coat, the single personal item he claimed was in the room, and leave.  The officers then questioned Orman about the gun.  She stated that she had seen both men handle the gun but that she did not know who owned it.  The officers asked Orman to have "James" exit the bathroom.  As Orman re-entered the room, Hoffman entered as well to prevent access to the gun.  Orman told Dickinson, through the bathroom door, that the police were present and wanted to speak to him.  Dickinson acknowledged he had heard her.  Orman was then allowed to take her possessions and leave.

¶5     Hoffman left the room, and he and Fiscus remained outside the motel room door waiting for Dickinson to emerge from the bathroom.  During this time, Fiscus saw two thin straws in an ashtray near the television.  She recognized them as straws that could be used for ingesting unlawful drugs.  After ten or fifteen minutes had passed and Dickinson had still not exited the bathroom, the motel manager took Fiscus to the rear of the motel and identified the bathroom window for that specific motel room.  Fiscus saw that the window was open and that a man's head was looking to the right and left through the screen.  She instructed him to go to the front door of the motel room and talk to the waiting officer.  He agreed to do so.  Fiscus, however, heard water running and a rustling of activity in the bathroom so she repeated her instruction to Dickinson two more times.

¶6     As Dickinson came out of the bathroom, Hoffman reentered the motel room once again to block access to the gun on the garbage can.  At approximately the same time

3

Fiscus returned and entered the motel room. Hoffman patted Dickinson down and asked if other weapons were in the room. Dickinson said no.[1] Hoffman had Dickinson sit at the foot of one of the beds, in close proximity to the previously-observed straws, and asked him for identification. Dickinson said he had none and repeatedly gave the officers a false name, birthplace and social security number. Hoffman ultimately was able to identify Dickinson based on his correctly-given birth date, at which time Hoffman handcuffed and arrested him for obstructing a peace officer. While Hoffman was escorting Dickinson from the room, Fiscus walked back to the bathroom and pushed the door open. When she did she observed a black backpack and a small torch in the bathroom. She then proceeded to leave the motel room, and as she did so, she noticed white powder around the edges of the two straws and observed a suspicious torch-like item on the floor between the beds.

¶7 Based upon Dickinson's suspicious behavior and the officers' observations of the straws with white residue, the backpack, torches and gun—all of which was left in place in the secured hotel room—the officers applied for a search warrant, suspecting unlawful drug activity. The warrant was issued and detectives discovered the second handgun in the bathroom. Its serial number had been obliterated. Additionally, the search rendered drug paraphernalia, methamphetamine, recipes for making methamphetamine, various ingredients listed on the recipes, torches, and syringes, among other items.

---

[1] In actuality, a later search pursuant to a warrant turned up a second loaded semi-automatic handgun in the bathroom.

¶8    In March 2006 Dickinson was charged by Information with felony criminal possession of dangerous drugs with intent to distribute and felony criminal possession of dangerous drugs as well as misdemeanor charges of criminal possession of drug paraphernalia, obstructing a peace officer or other public servant, and obscuring the identity of a firearm. He subsequently pleaded not guilty to the drug-related counts and bail was set at $75,000.

¶9    On May 9, 2006, Dickinson filed a motion to suppress the evidence seized pursuant to the search warrant. The court held an evidentiary hearing on the motion in June 2006. In July 2006 the District Court issued its Findings of Fact, Conclusions of Law, and Order denying the motion, from which Dickinson has appealed.

¶10    Subsequently, Dickinson moved to withdraw his not guilty pleas and entered pleas of nolo contendere to three counts—possession of dangerous drugs, possession with intent to distribute, and obstructing a peace officer. The other two counts were dismissed. He was sentenced to twenty years for possession, five years for intent to distribute, and six months for obstruction. The sentences were concurrent and all were suspended except for time served. Dickinson preserved his appeal rights.

## STANDARD OF REVIEW

¶11    We review a district court's denial of a motion to suppress evidence to determine if the court's findings are clearly erroneous. To determine whether a finding of fact is clearly erroneous, we ascertain whether the finding is supported by substantial evidence, whether the district court misapprehended the effect of the evidence, and whether the Court is nevertheless left with a definite and firm conviction that the district court made a

mistake. We further review a district court's denial of a motion to suppress to determine whether the court's interpretation and application of the law are correct. Our review is plenary as to whether the district court correctly interpreted and applied the law. *State v. Bieber*, 2007 MT 262, ¶ 20, 339 Mont. 309, ¶ 20, 170 P.3d 444, ¶ 20 (citation omitted).

**DISCUSSION**

¶12 *Issue: Did the District Court err in denying Dickinson's motion to suppress evidence?*

¶13 Dickinson argues that Fiscus' discovery of the backpack, the torch in the bathroom, the torch between the beds, and the powder on the straws did not constitute a "search incident to a lawful arrest." Relying on *State v. Olson*, 2002 MT 211, ¶ 14, 311 Mont. 270, ¶ 14, 55 P.3d 935, ¶ 14, he maintains that the purpose of a search incident to a lawful arrest is to locate and secure any weapons the detained person may use and/or to secure evidence which may be concealed or destroyed. Given this purpose, Dickinson asserts, such a search must be limited to the area within the immediate locale of the arrest and within the immediate reach of the person being arrested. *Accord, State v. Galpin*, 2003 MT 324, ¶ 54, 318 Mont. 318, ¶ 54, 80 P.3d 1207, ¶ 54. Dickinson contends that when Fiscus pushed open the bathroom door to look inside, her actions constituted a search that exceeded the parameters of a search incident to a lawful arrest because he did not have access to the bathroom while being questioned by Hoffman or while being escorted by Hoffman to the patrol car.

¶14 Dickinson also argues that Fiscus' search was not a justified "protective sweep." Citing *Olson*, ¶ 15, Dickinson acknowledged that officers are authorized to make a

6

precautionary protective sweep by looking in other spaces immediately adjoining the place of arrest in order to ascertain that there are no other persons "who are dangerous and could launch an unexpected attack," and that such a search does not violate an arrestee's right to be free from unreasonable searches and seizures. He asserts, however, that for a protective sweep to be justified, "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Olson*, ¶ 15. Dickinson posits that the officers provided no articulable facts at the suppression hearing to support a valid protective sweep. He notes that Hoffman and Fiscus had been told by Phillips and Orman that only one other person was in the motel room—Dickinson, who was in the shower. Furthermore, while Fiscus was unable to see clearly through the bathroom window when she was outside, she testified that she heard no other voices coming from the bathroom while she was instructing Dickinson to leave the bathroom. Dickinson maintains that without articulable facts, Fiscus' search of the bathroom was unlawful and in violation of his constitutional rights, and the resulting evidence should have been suppressed.

¶15     The State, relying on *Galpin*, counters that Fiscus reasonably opened the door of the bathroom out of concern that another person or additional weapons may have been hidden in there. It asserts that the motel room was small, Dickinson was not handcuffed, and the bathroom door, which was not tightly closed, was easily accessible from the bed on which Dickinson sat while being questioned. The State also opines that the officers had heightened cause for concern based on the evidence of unlawful drug activity and

7

this heightened concern justified Fiscus' look into the bathroom to ensure "there was no threat to the officers' safety, another person, or easily-destroyed evidence on the scene."

¶16 Additionally the State asserts that exigent circumstances justified Fiscus' decision to look into the bathroom—there was a known loaded gun in the motel room and Dickinson had lied when answering the officers' questions. Therefore, the officers did not know if another occupant was in the bathroom who could either present a danger to them or destroy evidence.

¶17 Dickinson responds that both officers had been present in the motel room during the time Hoffman questioned Dickinson, approximately ten minutes. The known gun in the room did not present a danger because Hoffman consistently kept himself between the gun and Dickinson. It was not until Hoffman was escorting a handcuffed Dickinson from the motel room that Fiscus decided to open the bathroom door. He maintains that these circumstances did not constitute exigent circumstances warranting "prompt action" to conduct a further search in a wholly separate room from where Dickinson had been detained and was ultimately arrested.

¶18 The Fourth Amendment to the U.S. Constitution and Article II, Section 11 of the Montana Constitution both protect citizens against unreasonable searches and seizures, and require warrants issued upon probable cause prior to a search by law enforcement officials. Warrantless searches are considered per se unreasonable unless an exception to the warrant requirement applies. *State v. Ruggirello*, 2008 MT 8, ¶ 17, 341 Mont. 88, ¶ 17, 176 P.3d 252, ¶ 17. Such exceptions include, as argued by the parties here, a search incident to a lawful arrest, exigent circumstances wherein valuable evidence may be

destroyed, or a protective sweep designed to protect officers from hidden dangers. *Olson*; § 46-5-102, MCA. As discussed above, Dickinson argued that none of these exceptions existed while the State argued that one or more of these exceptions did exist and justified Fiscus' search of the motel bathroom. However, the State did not offer as an alternative theory of justification that the items discovered during Fiscus' extended search inevitably would have been discovered upon issuance of the requested search warrant.

¶19 The "inevitable discovery" rule is an exception to the "exclusionary rule." The exclusionary rule bars evidence obtained as a result of an unconstitutional search or seizure, also known as "fruit of the poisonous tree," and is the primary vehicle which helps to ensure protection from an unreasonable governmental search or seizure. *State v. Ottwell*, 239 Mont. 150, 154, 779 P.2d 500, 502 (1989). However, we have long accepted three general exceptions to exclusion of this type of tainted evidence. In *State v. Allies*, 186 Mont. 99, 117, 606 P.2d 1043, 1052-53 (1979), we noted that "fruit of the poisonous tree" is admissible: (1) if it is attenuated from the constitutional violation so as to remove its primary taint (*Wong Sun v. United States*, 371 U.S. 471, 487-88, 83 S. Ct 407, 417 (1963)); (2) if it is obtained from a source independent of the defendant's confession (*Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S. Ct. 182, 183 (1920)); or (3) if it is inevitable that the evidence would have been discovered apart from the defendant's confession. *Government of Virgin Islands v. Gereau*, 502 F.2d 914, 927-28 (3rd Cir. 1974). The "inevitable discovery" exception was later expanded to

9

include tainted evidence obtained by methods beyond a defendant's confession. *State v. Pearson,* 217 Mont. 363, 366, 704 P.2d 1056, 1059 (1985).

¶20　As indicated above, the parties did not argue to the District Court or to this Court the "inevitable discovery" doctrine. And while we acknowledge that we do not traditionally address legal theories not raised by the parties, there are limited analyses in which this Court frequently engages, even if the parties have not urged us to do so. A classic example is the "harmless error" analysis, which is similar to the inevitable discovery exception.[2] In the typical "harmless error" situation, a defendant argues that a claimed error requires reversal, and in response the State asserts that no error occurred. Even if the State fails to argue the fallback position that if error occurred, it was harmless, we will still engage in the harmless error analysis in the event we conclude that an error was made, for the simple reason that we have everything in the record we need to make that determination, and a refusal to make the analysis would unnecessarily multiply the proceedings (e.g., remand for determination of whether the error was harmless, followed by a second appeal). The situation before us is similar in that Dickinson argues the court erred in failing to suppress the evidence and the State maintains it did not.

---

[2] *Nix v. Williams*, 467 U.S. 431 n. 4, 104 S. Ct. 2501 n. 4 (1984) ("The ultimate or inevitable discovery exception to the exclusionary rule is closely related in purpose to the harmless-error rule of *Chapman v. California*, 386 U.S. 18, 22 (1967). The harmless-constitutional-error rule 'serve[s] a very useful purpose insofar as [it] block[s] setting aside convictions for small errors or defects that have little, if any, likelihood of having changed the result of the trial.' The purpose of the inevitable discovery rule is to block setting aside convictions that would have been obtained without police misconduct.") *Accord U. S. v. Garcia*, 496 F.3d 495 (6th Cir. 2007); *U. S. v. Sasson*, 334 F. Supp. 2d 347 (E.D.N.Y. 2004); *State v. Butler*, 676 S.W.2d 809 (Mo. 1984). *See also U.S. v. Lee*, 159 Fed. Appx. 1 n. 10 (10th Cir. 2005) ("Our harmless error review is equivalent or similar to the 'inevitable discovery exception' which the government also did not raise as an alternative argument on appeal.").

¶21     While we have no cases which categorically state that we will apply the "inevitable discovery" doctrine sua sponte, it appears we did so in *Pearson*. Pearson argued that a police officer performed an illegal search resulting in the discovery of marijuana. This gave the officer probable cause to obtain a warrant to search Pearson's car, at which time cocaine was discovered. Pearson sought to have evidence of the cocaine suppressed on the ground that the original search was unlawful and the subsequently-discovered evidence was tainted. However, we held that other "plain view" evidence of illegal drug activity provided probable cause for a warrant under which the cocaine would have been "inevitably discovered."

¶22     It appears that other jurisdictions apply this doctrine sua sponte as well. In *People v. Clark*, 857 P.2d 1099 (Cal. 1993), the California Supreme Court affirmed the superior court's admission of blood test results drawn from Clark shortly after his arrest for rape and murder. The California Court concluded that the results were properly admitted. In doing so, the Court explained:

> In the . . . Superior Court, little time was devoted by either party to explaining the reasons why the court should grant or deny the motion to suppress the results of defendant's blood tests. The doctrine of inevitable discovery was not argued by either side. Nevertheless, as we have previously recognized, "[t]o close our eyes to the clear applicability of the inevitable discovery doctrine would run contrary to the settled principle of appellate review that a correct decision of the trial court must be affirmed on appeal even if it is based on erroneous reasoning.

*Clark*, 857 P.2d at 1125. *See also Abraham v. Kansas*, 67 Fed. Appx. 529, 534 (10th Cir. 2003) (Under the circumstances of this case, the court held "it was virtually inevitable that the police would have obtained a search warrant . . . and thereby discovered the

11

drugs and money."); *Garcia*, 496 F.3d at 505 ("We nonetheless affirm the admissibility of the pager because it would inevitably have been lawfully discovered and, in any event, the district court's denial of the motion to suppress the pager was harmless error.").

¶23 Most state and federal jurisdictions recognize the inevitable discovery doctrine. *Nix*, 467 U.S. at 440, 104 S. Ct. at 2507. Moreover, we have applied the inevitable discovery doctrine in numerous cases. In *State v. Notti*, 2003 MT 170, 316 Mont. 345, 71 P.3d 1233, we affirmed the district court's denial of Notti's motion to suppress DNA evidence obtained in one crime involving Notti and used to convict him of another crime. We concluded that based on the existence of other state databases, Notti's DNA profile would have been placed on the State's DNA Identification Index and would have inevitably led to the discovery of a match by one of the multiple databases. *Notti*, ¶ 20. In *State v. Clausell*, 2005 MT 33, 326 Mont. 63, 106 P.3d 1175, Clausell appealed his conviction for deliberate homicide in part on the ground he had ineffective assistance of counsel. He argued that counsel should have sought suppression of evidence obtained when the police entered his residence without a warrant. We determined that the officers "surely could have obtained a warrant to search Clausell's apartment based upon the events at the hospital, his inconsistent statements to police officers and medical personnel, and the discovery of the gun outside his apartment." Under such circumstances, the evidence seized at Clausell's apartment would have been allowed under the inevitable discovery doctrine. *Clausell*, ¶ 23.

¶24 We conclude that the question of whether items would have been inevitably discovered pursuant to execution of a valid search warrant is one we can answer sua

12

sponte, provided there is a sufficient record before us to make that determination. Therefore, we now turn to the case before us.

¶25 Dickinson argues that if the articles observed in the bathroom had been excised from the warrant application, the application would have failed, and the items would not have been discovered. In applying the inevitable discovery doctrine, we must determine whether the evidence observed outside of the bathroom would have been sufficient to support the issuance of the warrant and would have resulted in the inevitable discovery of the items in the bathroom. We frequently make such assessments. *See e.g. State v. St. Marks*, 2002 MT 285, 312 Mont. 468, 59 P.3d 1113; *State v. Tackitt*, 2003 MT 81, ¶ 41, 315 Mont. 59, ¶ 41, 67 P.3d 295, ¶ 41; *State v. Valley*, 252 Mont. 489, 493, 830 P.2d 1255, 1258 (1992). We are aware that in applying this doctrine, we "must not lose sight of the protections guaranteed by the Constitution" and thus it must appear "as certainly as night follows day, the evidence would have been discovered without reference to the violation of the defendant's rights." *Allies*, 186 Mont. at 118, 606 P. 2d at 1053.

¶26 To determine whether the challenged evidence would have been discovered under the search warrant issued in the case before us, we review the application for the warrant. As noted above, the application referred to the two straws with white residue on the ends, the loaded semi-automatic pistol behind the door, the evasive behavior of Dickinson both in terms of his refusal to leave the bathroom immediately upon being ordered to do so and his repeated lies about his identity, the torch-like item in the bedroom of the motel and the backpack and torch-like item in the bathroom. Dickinson claims the backpack and torch in the bathroom were observed during an unlawful search. He also asserts that

13

because Fiscus did not observe the white residue on the straws and the torch item in the bedroom until after her unlawful search of the bathroom, all of this evidence must be suppressed. He further claims that the remaining evidence available to the officers was insufficient to justify the issuance of a warrant. We disagree.

¶27 First, Dickinson does not dispute on appeal that Hoffman and Fiscus were lawfully in the bedroom; therefore, whatever items they observed while in this room are "fair game" for the warrant application. If we assume for the sake of argument that the search of the bathroom was illegal, the backpack and the torch observed in the bathroom would be excised from the warrant application. This leaves as a basis for application for the warrant the following items that were observed in the bedroom itself, as well as Dickenson's actions: a loaded semi-automatic handgun, two straws with white residue on them, a torch-like item lying on the floor between the beds, and Dickinson's delay in leaving the bathroom after being ordered to do so, as well as his lying to police officers about his identity. Clearly, this remaining evidence was more than sufficient to support the issuance of a warrant. It is equally obvious that once the warrant was executed, the backpack and the torch observed by Fiscus in the bathroom, as well as the second handgun and other drug paraphernalia, would have inevitably been discovered by the searching officers.

¶28 Having determined that the evidence sought to be suppressed by Dickinson would have been discovered when the officers returned to search the room and bathroom pursuant to the search warrant, we need not address Dickinson's arguments that the

14

search was not a proper search incident to an arrest or a proper protective sweep of the premises.

¶29    As we have noted in the past, we will affirm a court's decision even if it reaches the right result for the wrong reason. *Wells Fargo Bank v. Talmage,* 2007 MT 45, ¶ 23, 336 Mont. 125, ¶ 23, 152 P.3d 1275, ¶ 23.

## CONCLUSION

¶30    For the foregoing reasons, we affirm the District Court's denial of Dickinson's motion to suppress the evidence.

/S/ PATRICIA COTTER

We concur:

/S/ KARLA M. GRAY
/S/ JOHN WARNER
/S/ BRIAN MORRIS

Justice John Warner concurs.

¶31    I concur with the Court's opinion.  In addition, in my view, the facts outlined in ¶¶ 15-16 justify the action of Officer Fiscus in walking to the bathroom and pushing the door open while Officer Hoffman was escorting Dickinson from the motel room.

¶32    Section 46-5-102, MCA, permits warrantless searches of the area within the arrestee's presence for the following purposes:  (1) to protect the officer from attack; (2) to prevent the arrestee from escaping; (3) to discover and seize fruits of the crime; or (4)

15

to discover and seize any people or items which may have been used in committing – constitute evidence of – a crime.

¶33 Exigent circumstances which justify a warrantless search are those that would cause a reasonable person to believe prompt action is necessary to prevent physical harm to police officers or other persons. *State v. Logan*, 2002 MT 206, ¶ 17, 311 Mont. 239, ¶ 17, 53 P.3d 1285, ¶ 17. In assessing exigent circumstances, we have said that the court must consider the totality of such circumstances. *State v. McCarthy*, 258 Mont. 51, 57, 852 P.2d 111, 115 (1993). Based on the facts of this case, there were clearly exigent circumstances justifying a look in the bathroom. The two officers had a reasonable, genuine concern for their personal safety. The motel room was small and there was at least one loaded handgun in the room. There was evidence not only of the presence of dangerous drugs, but that someone had been using them. The officers were turning their backs on the room with a loaded gun in it, and they had not looked in the bathroom to see if anyone was in there. If someone had been hiding in the bathroom, they naturally would not have made any noise. In my view, these officers would have been foolhardy not to check the bathroom to make sure that no one was in there before they walked away. The District Court was correct in denying the motion to suppress.

/S/ JOHN WARNER

Justice Jim Rice joins in the foregoing concurrence.

/S/ JIM RICE