**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

VUE LEE,

Defendant-Appellant.

No. 04-8117
(D. Wyo.)
(D.Ct. No. 04-CR-114-CAB)

**ORDER AND JUDGMENT**[*]

Before **BRISCOE**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **LUCERO**, Circuit Judge.

Appellant Vue Lee pled guilty to one count of conspiracy to possess with intent to distribute, and to distribute Ecstacy; and one count of possession with intent to distribute and to distribute Ecstacy, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 846. He appeals, having reserved his right to challenge the district court's ruling on his motion to suppress evidence. We

---

[*] This order and judgment is not binding precedent except under the doctrines of law of the case, *res judicata* and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I.  Factual Background

On April 16, 2004, while conducting a stationary radar on the east bound lane of Interstate 80 at 7:25 a.m., Wyoming Highway Patrol Trooper Tim Boumeester observed a silver Honda vehicle traveling ninety miles per hour in a seventy-five mile per hour speed zone.[1]  After Trooper Boumeester initiated the traffic stop, he asked the driver, Mr. Ole Phetphommasouk, if he knew how fast he was going, to which he admitted he was driving ninety miles per hour. Trooper Boumeester then requested his driver's license, registration, and proof of insurance, to which Mr. Phetphommasouk responded his driver's license was suspended.  Instead, Mr. Phetphommasouk produced a California identification

---

[1] On initiating the traffic stop, the trooper activated a video recorder, with the camera situated in the cab of the patrol car, facing forward and photographing the Honda from the rear.  He also activated an audio device which recorded the entire stop.

While the tape was submitted as evidence and designated on appeal, neither party provided either a written transcript of the tape or tangible references to the tape for the purpose of providing a record citation, leaving the task of deciphering the taped conversations and timing of each to this court.  Moreover, after reviewing the tape, it is evident some of the facts cited in the briefs and at oral argument are inconsistent with the tape, which clearly speaks for itself.  We remind counsel that proper reference to evidence designated on appeal should be provided to this court.  *See* Fed. R. App. P. Rule 28 (a)(7), (9)(A) and (b); 10th Cir. Rule 28.2(C)(2).

card, together with the insurance and vehicle registration documents. On looking at these documents, Trooper Boumeester asked Mr. Phetphommasouk which address he lived at, to which he responded he lived at neither address. Trooper Boumeester also asked the passenger, Mr. Vue Lee, for his driver's license in order to determine if Mr. Lee could drive the vehicle, given the apparent suspended status of Mr. Phetphommasouk's driver's license.[2] The trooper then asked Mr. Phetphommasouk to come to his patrol car while he checked the documentation and the driving status of both individuals and issued a speeding citation. He also told Mr. Lee he could roll up the driver's window of the Honda so he did not get cold.

While in the patrol car and writing out the citation, the trooper conversed with Mr. Phetphommasouk about his and Mr. Lee's travel plans, to which Mr. Phetphommasouk responded they were driving from Sacramento, California, to Sioux Falls, South Dakota, to visit Mr. Lee's friend and that Mr. Phetphommasouk was flying back in a couple of weeks. He also told Trooper Boumeester he would stay in Sioux Falls for only a week or two, while Mr. Lee

---

[2] We agree with the district court that the trooper's request for Mr. Lee's driver's license was reasonable for the purpose of ensuring he was legally capable of driving the car, given Mr. Phetphommasouk's statement his driver's license was suspended.

planned to stay a month.  The trooper then asked Mr. Phetphommasouk if he had a plane ticket, to which he replied "no," but that Mr. Lee's friend in Sioux Falls would "pick it up."  The trooper asked if Mr. Phetphommasouk had a job, to which he responded "no."  When asked, Mr. Phetphommasouk explained Mr. Lee's friend's name was "Boomer," and then "Johnny," and that Mr. Lee had known him since he was a kid.

Trooper Boumeester next explained to Mr. Phetphommasouk he could not drive any more because of his suspended license; he was getting two citations, one for driving with a suspended license and one for driving ninety miles per hour; and he would have to appear in court for having a suspended license, but could pay the other citation fine by mail.  Trooper Boumeester then told Mr. Phetphommasouk to "hang tight," while he conversed with the dispatcher.[3]

During his subsequent discussion with the dispatcher, the trooper learned both Mr. Phetphommasouk's and Mr. Lee's driver's licenses were valid.  After Trooper Boumeester informed Mr. Phetphommasouk his license was valid, he asked him where it was, to which Mr. Phetphommasouk responded he had lost it.

---

[3] During this period, the trooper encountered problems with his portable phone and asked Mr. Phetphommasouk to hand him the cord for his cellular phone, contributing to the length of the detention.

Apparently, for the purpose of putting his current address on the citation, the trooper asked Mr. Phetphommasouk for his current address, to which Mr. Phetphommasouk responded he had no current address, but indicated on further questioning he did not live with Mr. Lee, but lived with Mr. Lee's sister. When asked where he planned on staying in Sioux Falls, he responded he didn't know, but referred again to Mr. Lee's friend in Sioux Falls, and reiterated he was flying back and the friend would pay for his ticket. While the trooper continued to write out the citation, Mr. Phetphommasouk asked questions about the citation and for directions to Sioux Falls. After the trooper answered Mr. Phetphommasouk's questions, he had Mr. Phetphommasouk sign the citation and gave him a copy of it. He also returned Mr. Phetphommasouk's California identification card, but retained the vehicle insurance and registration documents.

During the stop, Trooper Boumeester reviewed the vehicle's documents and noticed neither Mr. Phetphommasouk nor Mr. Lee was listed as an owner on the registration or insurance documents; instead, the documentation listed "Thao Lee" as the owner but bore the same address as Mr. Lee's. Because the vehicle was not registered to either Mr. Phetphommasouk or Mr. Lee, the trooper told Mr. Phetphommasouk to "hang tight" because he needed to check some numbers on the vehicle, and that he could either stand outside the car or wait inside where it

was warmer; Mr. Phetphommasouk elected to stay in the patrol car. The entire conversation with Mr. Phetphommasouk, from the time of the initial stop to providing him the citation, lasted fifteen minutes.

Immediately thereafter, at 7:41 a.m., Trooper Boumeester opened the Honda's front driver side door, explaining to Mr. Lee, who was still in the front passenger's seat, that he was going to check the vehicle identification number on the car. Mr. Lee voluntarily told the trooper the vehicle was registered under his parents' names. The trooper then handed Mr. Lee his driver's license, stating, "here's that." He then asked Mr. Lee if he and Mr. Phetphommasouk lived together in California, to which he said, "yes." While handing back the rest of the documentation to Mr. Lee, saying, "here's that stuff," Trooper Boumeester also asked where the two were going, and then stated, "let me come around to that side so I don't get hit." Trooper Boumeester later testified he also came around to the passenger's side because Mr. Lee said something in response which he could not hear. When the trooper opened the front passenger door, Mr. Lee answered his question, saying they were heading to Sioux Falls, South Dakota, and on further questioning explained they left California on Thursday to visit a friend called "Johnny Champagne" and that they would both stay at his place for about two weeks. During this conversation, the trooper also asked if they were

employed, to which Mr. Lee responded he was employed with an insurance company, but he was not sure if Mr. Phetphommasouk was employed. The entire conversation with Mr. Lee lasted just over two minutes.

Trooper Boumeester then said he would be right back and returned to the patrol car where he asked Mr. Phetphommasouk if he had any questions. The trooper then asked Mr. Phetphommasouk if he would mind him asking a couple more questions "to get some things straight," to which he agreed. In response to the trooper's question whether he lived with Mr. Lee, he said he lived with Mr. Lee's sister, and in response to how long he planned to stay in Sioux Falls, he stated he didn't plan to stay long and had "no idea" about Mr. Lee. He also answered questions about their employment status, stating he was unemployed, and inaudibly responding as to Mr. Lee's employment status. The trooper then asked if the vehicle contained anything illegal, including drugs, cocaine, marijuana, methamphetamine, or large sums of illegal money, to which Mr. Phetphommasouk responded "no" to each. Mr. Phetphommasouk then consented to a search of the vehicle.[4] This second conversation with Mr. Phetphommasouk

[4] When asked if he had any problems with the trooper searching the vehicle or its contents, Mr. Phetphommasouk said "talk to him," meaning Mr. Lee. Trooper Boumeester told him, "I'm going to ask him, too, but you don't have a problem with that?" to which Mr. Phetphommasouk said, "O.K." and nodded

(continued...)

lasted under two minutes.

At approximately 7:45 a.m., the trooper went back to the passenger side of the Honda and in a conversational tone asked Mr. Lee, "Can I talk to you out here a minute?" to which he agreed. The trooper asked Mr. Lee if he and Mr. Phetphommasouk lived together, to which he responded "no," but that they lived in the same state; Trooper Boumeester then asked Mr. Lee why he had earlier said they lived together, to which Mr. Lee responded that the trooper had asked if they lived together in California. The trooper then asked Mr. Lee if the vehicle contained anything "illegal," including marijuana, cocaine, methamphetamine, heroin, or illegal sums of cash, to which Mr. Lee responded in the negative. When the trooper asked Mr. Lee if he could search the vehicle and its contents, Mr. Lee verbally agreed.[5] He also asked Mr. Lee, "are you guys responsible ...

_____

[4](...continued)
affirmatively. Mr. Lee concedes Mr. Phetphommasouk consented to the search.

[5] The trooper first asked Mr. Lee if he had a problem with him searching the vehicle and its contents and then after an inaudible response, the trooper repeated the question, stating, "you don't have a problem with that," and then after another inaudible response, the trooper said, "I'm going to ask you again," and then asked Mr. Lee if he had a problem with him searching the vehicle, to which Mr. Lee responded, "no." Mr. Lee does not contend he did not give verbal consent, but appeals the circumstances leading to such consent.

for everything that's in the vehicle?" to which Mr. Lee said, "yes."[6] The trooper then told Mr. Lee to stand out of the way in a ditch which was some thirty feet away, and also directed him not to come up towards the car while he searched it. This second conversation with Mr. Lee, prior to the search of the vehicle, lasted only two minutes. Trooper Boumeester then asked Mr. Phetphommasouk if they were responsible for what was in the vehicle, to which he responded, "I believe so." It is important to note that up to this time, Trooper Boumeester's tone toward both Mr. Phetphommasouk and Mr. Lee was courteous and conversational, and his encounters with them were cooperative and conducted without threat or other coercive means.

For almost ten minutes, from 7:48 a.m. to almost 7:57 a.m., Trooper Boumeester conducted a search of the vehicle's trunk and the interior passenger side of the vehicle, taking one radio call during that period. At 7:57 a.m., Trooper Boumeester began searching the interior driver side of the vehicle. Within a minute, the trooper found a pair of black dress shoes underneath a towel on the floor behind the driver's seat and inside, a plastic bag with smaller "Ziploc" bags smeared with green gel, and yellow and blue tablets inside the bags

---

[6] While the trooper testified Mr. Phetphommasouk stated they were responsible for everything in the vehicle, the tape reveals Mr. Lee also stated they were responsible for everything in the vehicle.

with print marks which made him believe they were Ecstacy. Trooper Boumeester pulled his head out of the vehicle, held up the package, and twice asked Mr. Lee in a "louder," "more authoritative," and "more excited" voice, "What are these?" He then demanded, "What are they?" to which Mr. Lee answered, "Ecstacy." During this time, Mr. Lee continued to stand approximately thirty feet from Trooper Boumeester, who was the only officer at the scene and who did not draw his gun or physically restrain Mr. Lee in any manner.[7] A field test subsequently confirmed the tablets were Ecstacy, and further investigation ultimately revealed the bag contained 787 tablets, or 158.7 grams, of Ecstacy.

## II. Procedural Background

Mr. Lee brought a motion to suppress the evidence obtained during the traffic stop. During the suppression hearing, Trooper Boumeester testified, and the video tape of the traffic stop was received into evidence, with portions of the tape played during the hearing. Trooper Boumeester testified he has been in law enforcement for seven and one-half years, obtained specialized training in

---

[7] After Mr. Lee stated the package contained Ecstacy, Officer Boumeester asked him to turn around, handcuffed him, and told him to sit down; he then approached Mr. Phetphommasouk and also handcuffed him. The government concedes that at this point any later admissions or statements obtained from Mr. Lee occurred during his custody and were subject to a *Miranda* warning. None of his later statements are the subject of this appeal.

highway interdiction, has been personally involved in thirty to forty interdiction stops involving drugs, and makes approximately ten traffic stops a day. Based on his training and experience, the trooper testified his attention was drawn to the fact that neither occupant was listed on the insurance documentation or vehicle registration, that this factor was prevalent in prior highway drug seizure interdiction cases, and that it is his standard procedure to check the vehicle identification number even when the last name and address match an occupant, but the first name does not. He also testified certain aspects of Mr. Phetphommasouk's travel plans caught his attention, including the fact he and Mr. Lee were traveling together but had separate return dates weeks apart; he was flying back but had not obtained the ticket and was having Mr. Lee's friend, whom he did not know, buy the ticket for him; he was unemployed yet able to take a two-week vacation; and he did not know where he was staying in Sioux Falls. He also testified these facts were similar to other highway interdiction cases he had been involved in which included inconsistent travel plans, vehicle occupants not knowing how long they were going to stay at a destination, and an occupant flying back without knowing who would buy the plane ticket.

Trooper Boumeester also testified he directed Mr. Lee to stand thirty feet away, on the side of the road and out of the way of traffic, for his and Mr. Lee's

safety, and that if Mr. Lee had approached him during the search while he had his back turned or if Mr. Lee had approached the patrol car, he would have ordered him back down in the borrow ditch for similar safety reasons. He testified it is standard operating procedure to remove occupants from a vehicle while searching it.

Mr. Lee also testified, explaining that while the car belonged to his parents, he primarily drove it and contributed to the payments. After hearing the evidence and the parties' arguments, the district court issued a written order denying the motion to suppress. The district court determined the trooper was entitled to ask for Mr. Lee's driver's license because the driver indicated his license was suspended, and he could also inquire about Mr. Lee's travel plans and his relationship with the driver. It also held both of Mr. Lee's conversations with the trooper after his documents were returned were consensual; Mr. Lee consented to the trooper's search of the vehicle; and he was not in custody for the purpose of receiving a *Miranda* warning until he was handcuffed. *See generally Miranda v. Arizona*, 384 U.S. 436 (1966). Following the suppression hearing and the district court's order on the motion to suppress, Mr. Lee pled guilty to one count of conspiracy to possess with intent to distribute, and to distribute Ecstacy; and one count of possession with intent to distribute and to distribute Ecstacy, in violation

of 21 U.S.C. §§ 841(a)(1), (b)(1)(C), and 846, but reserved the right to appeal the district court's ruling on his suppression motion. In addition, Mr. Lee "cleared" his co-defendant, Mr. Phetphommasouk, by taking full responsibility for possession of the Ecstacy. Thereafter, the district court sentenced him to two thirty-month terms of imprisonment, one for each count, to run concurrently.

## III. Discussion

### A. Consent to Search

On appeal, Mr. Lee does not challenge the initial traffic stop. Rather, the thrust of his argument centers on his assertion the trooper unreasonably detained him by separating and interrogating him and Mr. Phetphommasouk, which he claims made his later consent to search the vehicle invalid. In support of this argument, he contends the trooper failed to inform him he was free to leave once he returned his driver's license and vehicle documentation, and that an illegal detention continued, as evidenced by: 1) retention of his traveling companion in the patrol car; 2) the unnecessary verification of the identification number on the vehicle, after which the trooper should have concluded the stop; 3) the trooper's intrusive, irrelevant questions to Mr. Lee, which went beyond the proper scope of the traffic stop, including questions on whether he and Mr. Phetphommasouk lived together and if they were employed; and 4) the lack of reasonable suspicion

to detain either individual, given what he characterizes as their consistent and credible answers to the trooper's questions. But for the alleged illegal detention, Mr. Lee argues, the trooper would not have obtained his eventual consent to search the vehicle.

We begin with our standard of review on motions to suppress, and the law applicable to traffic stops and searches, drawing substantially from our decision in *United States v. Rosborough*, 366 F.3d 1145 (10th Cir. 2004). "In reviewing a district court's denial of a motion to suppress, we consider the evidence in the light most favorable to the government and accept the trial court's findings of fact unless they are clearly erroneous." *Id.* at 1148. In reviewing a district court's ruling on motion to suppress evidence, we may affirm the district court "on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court." *United States v. Edwards*, 242 F.3d 928, 935 (10th Cir. 2001) (quoting *United States v. Sandoval*, 29 F.3d 537, 542 n.6 (10th Cir. 1994)). "'The credibility of witnesses, the weight to be given evidence, and the reasonable inferences drawn from the evidence fall within the province of the district court.'" *Rosborough*, 366 F.3d at 1148 (quoting *United States v. Long*, 176 F.3d 1304, 1307 (10th Cir. 1999)). "We review de novo the ultimate determination of reasonableness under the Fourth Amendment, 'keeping

in mind that the burden is on the defendant to prove that the challenged seizure was illegal ....'" *Id.* (alteration omitted).

We analyze traffic stops under the principles pertaining to investigative detentions, as articulated in *Terry v. Ohio*, 392 U.S. 1 (1968), making a dual inquiry of "whether the officer's action was justified at its inception," and whether the detention was "reasonably related in scope to the circumstances which justified the interference in the first place." *Id.* at 19-20. In this case, Mr. Lee concedes the first inquiry, acknowledging the trooper's justification for the traffic stop based on the speeding violation. Focusing on the second *Terry* inquiry, we recognize that "[i]n the context of routine traffic stops, a law enforcement officer may generally request a driver's license, registration, and other required papers, run requisite computer checks, and issue citations or warnings as appropriate." *Rosborough*, 366 F.3d at 1148 (citation omitted). We have held that "[f]urther detention is appropriate only if during the course of the traffic stop, (1) the officer develops an 'objectively reasonable and articulable suspicion' that the driver is engaged in some illegal activity, or (2) 'the initial detention ... becomes a consensual encounter.'" *Id.* (quoting *United States v. McRae*, 81 F.3d 1528, 1534 (10th Cir. 1996)). "One reoccurring factor supporting a finding of reasonable suspicion is the inability of a defendant to provide proof

that he is entitled to operate the vehicle he is driving." *United States v. Villa-Chaparro*, 115 F.3d 797, 802 (10th Cir. 1997) (quotation marks, citation and alteration omitted). In addition, we have held questions about travel plans are routine and may be asked as a matter of course without exceeding the proper scope of a traffic stop. *United States v. Bradford*, 423 F.3d 1149, 1156 (10th Cir. 2005); *United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir. 2001); *United States v. West*, 219 F.3d 1171, 1176 (10th Cir. 2000). While such questions may fall within the scope of a traffic stop, we have held "citizens' legitimate privacy interests are protected in that they are not legally obligated to answer such questions, nor can an officer compel an answer to these routine questions." *Williams*, 271 F.3d at 1267.

We have also said "[a] traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority." *Bradford*, 423 F.3d at 1158 (citation omitted). "A consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer." *Id.* (quotation marks omitted). Whether an encounter is consensual "depends on whether the police conduct would have conveyed to a reasonable person that he or

she was not free to decline the officer's requests or otherwise terminate the encounter." *Id.* (quotation marks omitted). During such a consensual encounter, "[a]n officer is not required to inform a suspect that [he] does not have to respond to ... questioning or that [he] is free to leave." *Id.; see also United States v. Manjarrez*, 348 F.3d 881, 886 (10th Cir. 2003), *cert. denied*, 541 U.S. 911 (2004); *United States v. Patten*, 183 F.3d 1190, 1194 (10th Cir. 1999). "Fourth Amendment reasonableness of a traffic stop ... must be judged by examining both the length of the detention and the manner in which it is carried out." *United States v. Holt*, 264 F.3d 1215, 1230 (10th Cir. 2001). Finally, consent is a question of fact determined by considering the totality of the circumstances. *See Manjarrez*, 348 F.3d at 885.

Applying these principles, we review the trooper's encounter with the driver, Mr. Phetphommasouk, only for the purpose of ascertaining the reasonableness of questions later asked of Mr. Lee. During the trooper's conversation with Mr. Phetphommasouk which occurred during the initial traffic stop detention and prior to the return of any documentation, the trooper asked Mr. Phetphommasouk permissible, routine questions about his travel plans while he checked on the status of both individuals' driver's licenses. Mr. Phetphommasouk voluntarily answered those questions and, in so doing, gave answers which caused

the trooper to suspect, based on his training and experience, that Mr. Phetphommasouk and Mr. Lee were engaged in some illegal drug activity, warranting further investigative detention. As Trooper Boumeester testified, Mr. Phetphommasouk's remarks on their travel plans raised suspicion of illegal activity because they were traveling together but had separate return dates weeks apart; Mr. Phetphommasouk was flying back but had not obtained the ticket and was having Mr. Lee's friend, whom he did not know, buy the ticket for him; and Mr. Phetphommasouk did not know where he was staying in Sioux Falls.

Applying the applicable standard of review, we proceed to the questions posed to Mr. Lee prior to the search of his vehicle. First, because the trooper noticed neither Mr. Phetphommasouk nor Mr. Lee was listed as the registered owner, it was not unreasonable for him to check the vehicle identification number, *see Villa-Chaparro*, 115 F.3d at 802, and at the same time ask Mr. Lee the same routine travel questions, which he did in order to verify the suspicious travel plans already articulated by Mr. Phetphommasouk. *See United States v. Alvarez*, 68 F.3d 1242, 1245 (10th Cir. 1995) (holding questioning of passenger reasonable because conflicting responses between the driver and passenger could lend support to suspicion of illegal activity). In addition, their first conversation was clearly consensual, as Mr. Lee voluntarily responded to the trooper's non-

coercive questioning. *Bradford*, 423 F.3d at 1158. During their second two-minute conversation, the trooper asked Mr. Lee in a conversational tone if he could talk to him, to which he agreed, and therefore, those questions were also consensual. Moreover, these questions were also reasonable, given the trooper's earlier conversations with both individuals were peppered with inconsistencies, including those relating to their travel plans; *i.e.,* where, with whom (Johnny Champagne or Boomer), and how long they planned to stay in Sioux Falls, which only further raised an objective and articulable suspicion of illegal drug activity. *Alvarez*, 68 F.3d at 1245 (holding officer's second inquiry, in which he asked identical questions already posed and answered, was reasonable based on the officer's reasonable suspicion of unlawful activity).

Not only were all of the trooper's questions during these two conversations non-coercive and voluntarily answered by Mr. Lee, but the trooper's questions on their living arrangements were reasonable, given Mr. Phetphommasouk could not provide an address, which was obviously needed for the citation.[8] This fact led

_____

[8] Specifically, Mr. Phetphommasouk's identification card did not match the address on the vehicle registration and insurance documentation, prompting Trooper Boumeester early in the stop to asked him at which address he lived, to which Mr. Phetphommasouk responded he lived at neither address. Later, when writing out the citation, the trooper asked him for his current address, to which Mr. Phetphommasouk responded he didn't have one; so the trooper reasonably

(continued...)

-19-

the trooper to question Mr. Lee on where Mr. Phetphommasouk lived, asking him in their first conversation if he lived with Mr. Phetphommasouk in California, to which he said "yes," thereby providing an apparent inconsistent answer with that of Mr. Phetphommasouk, who stated he did not live with Mr. Lee. Similarly, because Mr. Phetphommasouk had already made suspicious remarks about their travel plans, it was reasonable for the trooper to inquire about Mr. Phetphommasouk's employment status to ascertain how Mr. Phetphommasouk planned to pay for the trip or flight back. Considering Mr. Phetphommasouk's response that he was unemployed but traveling cross-country (obviously at some expense), it was not unreasonable to also question Mr. Lee on his employment status to ascertain how they were financing their trip, especially given the trooper's suspicion of illegal drug activity.

Next, we reject Mr. Lee's contention an illegal detention occurred because the trooper never explicitly told him he was free to leave while they conversed at the car. At this juncture during the consensual encounter, the trooper was not required to inform him he did not have to respond to his questions or was free to

---

[8](...continued)
posed questions to ascertain his address, asking him if he lived with Mr. Lee, whose address appeared on the vehicle documents, and instead, finding out he lived with Mr. Lee's sister.

-20-

leave. *Bradford*, 423 F.3d at 1158. Instead, it is clear their very brief, two-minute conversations included the return of Mr. Lee's documentation and otherwise involved brief, non-coercive questions[9] which we have already ascertained Mr. Lee voluntarily answered and which were otherwise supported by an "objectively reasonable and articulable suspicion" they were engaged in some illegal activity warranting further investigative detention. *See Rosborough*, 366 F.3d at 1148. Similarly, we cannot agree the trooper's separation of Mr. Lee from Mr. Phetphommasouk, who was taken to the patrol car out of highway traffic and the cold, and who elected to stay in the car, somehow turned the traffic stop into an illegal detention. Thus, based on the totality of the circumstances in this case, it is apparent the trooper's brief encounters with Mr. Lee were either voluntary and consensual, as determined by the district court, or otherwise based on an objective and articulable suspicion sufficient to warrant the further investigative detention and questioning of Mr. Lee beyond the time required for an initial stop.

For the same reasons, we cannot say Mr. Lee's verbal consent to search the vehicle was premised, as he contends, on a prior illegal or tainted detention which induced him to consent. Rather, it is clear Mr. Lee "freely and voluntarily

---

[9] Our analysis does not include consideration of the trooper's questions to Mr. Lee on the contents of the Ziploc bag, which we discuss hereafter.

-21-

consented to the search of the vehicle," which "is a question of fact based on the totality of the circumstances," we review for clear error. *See Rosborough*, 366 F.3d at 1149. In so concluding, we consider whether the officer's conduct constituted a coercive show of authority such that a reasonable person would believe he was not free to "decline the officer's requests or otherwise terminate the encounter." *Id.* (internal quotation marks and citation omitted). "Factors tending to show that consent was coerced include the presence of more than one officer, the display of weapons, physical touching, and use of an aggressive tone." *Id.* Our review of the record on appeal, including the video tape of the traffic stop, plainly establishes these circumstances did not exist when Mr. Lee voluntarily consented to the search. For these reasons, no Fourth Amendment violation occurred.

B. Lack of *Miranda* Warning Prior to Identification of Contraband

Mr. Lee next contends the trooper's "repeated demand of [him] to identify the suspected contraband, without the benefit of *Miranda*, violated [his] Fifth Amendment right to remain silent." By being placed in the borrow ditch on a rural stretch of interstate highway during the search, Mr. Lee contends he was already "'in custody' for practical purposes," and therefore, he was "'entitled to the full panoply of protections prescribed by *Miranda*'" before the trooper asked

him to identify the items in the Ziploc bag, asking twice "What are these?"; and then more forcefully demanding, "What are they?" before Mr. Lee answered, "Ecstacy." He buttresses his argument by maintaining: 1) "he was not given the option of refusing to answer the officer's excited demands," 2) "[h]is momentary hesitation resulted in the officer repeating the question with [an] increasingly angry tone," and 3) "the officer's demeanor [made it] clear that [he] did *not* have the option of remaining silent," and "contributed to a police dominated atmosphere." According to Mr. Lee, asking him to identify the suspected drugs required him to incriminate himself, implicating his right to a *Miranda* warning before such questioning.

The crux of Mr. Lee's argument appears to be that his statement identifying the drug as "Ecstacy" implicated him in a crime for which he was ultimately convicted, and therefore, without his identification of the drug, his guilt would have been in question. Clearly, a statement taken during a custodial interrogation in violation of the *Miranda* rule cannot be admitted to establish the defendant's guilt. *Berkemer v. McCarty*, 468 U.S. 420, 429 (1984). However, before *Miranda* is applicable, two requirements must be met: 1) the suspect must be in "custody"; and 2) the questioning must meet the legal definition of an "interrogation." *United States v. Perdue*, 8 F.3d 1455, 1463 (10th Cir. 1993).

With respect to the latter, an "interrogation includes 'any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *Id.* at 1464 (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). With respect to the other requirement, whether a defendant is in "custody" depends on an examination of all the relevant facts and how a "reasonable person in the suspect's position would have understood his situation," *id.* at 1463 (quoting *Berkemer*, 468 U.S. at 442), including whether a reasonable person would believe his or her "freedom of action had been curtailed to a degree associated with a formal arrest." *United States v. Griffin*, 7 F.3d 1512, 1518 (10th Cir. 1993) (quotation marks and citation omitted). To determine if a "custody" situation occurred, we review the totality of the circumstances, including whether the suspect was informed that he or she could refuse to answer questions or terminate the encounter; whether limited questioning occurred for the purpose of confirming suspicions; and whether the circumstances established a police dominated atmosphere, such as 1) separation of the suspect from family or colleagues who could offer moral support; 2) isolation in nonpublic locations; 3) threatening presence of several officers; 4) display of a weapon by an officer; 5) physical contact with the subject; and 6) tone of voice and manner of questioning indicating compliance might be compelled. *Id.* at 1518-19.

Admittedly, as Mr. Lee contends, he was placed in a borrow ditch on a rural stretch of interstate highway and told not to approach the officer and the car; he was not explicitly told he could refuse to answer the questions on what the bag contained; he was separated from his counterpart when questioned about the bag; and the trooper's tone became much more forceful and demanding with respect to his questions on the bag's contents. On the other hand, as the government points out, Mr. Lee's documents were returned before he was questioned on the contents of the bag; no degree of threat of physical restraint or coercion occurred in the trooper's questioning about the bag's contents, including the display of a weapon; the trooper raised his voice, but did not in any way threaten Mr. Lee; only one officer questioned him, diminishing the likelihood of a police dominated atmosphere; and the trooper's removal of Mr. Lee to the ditch away from both traffic and the vehicle while the trooper conducted his search was standard procedure and done for legitimate safety concerns. *See Maryland v. Wilson*, 519 U.S. 408, 412, 415 (1997) (holding removal of a passenger from a vehicle for security and safety reasons is legitimate during a *Terry* stop). In addition, with respect to Mr. Lee's separation from Mr. Phetphommasouk, we note protection from highway traffic and inclement weather conditions may justify a law enforcement officer relocating a driver to the patrol car for traffic stop questioning, which in this case appears to have contributed to the initial

separation of the two individuals involved, s*ee United States v. Manbeck*, 744 F.2d 360, 379 (4th Cir. 1984), and continued because Mr. Phetphommasouk elected to stay in the patrol car where it was warmer. Finally, with respect to the rural circumstances Mr. Lee suggests created a custodial environment, we acknowledge the traffic stop occurred in a rural setting, but it was not in a remote location. Instead, it occurred in clear public view on a highly traversed interstate roadway, where passersby could witness the interaction between officer and motorist, thereby reducing the ability of the officer to use illegitimate means to elicit self-incriminating statements and diminishing the motorist's fear that if he did not cooperate he would be subjected to abuse. *See Perdue*, 8 F.3d at 1466.

Viewing these facts under the totality of the circumstances, we conclude Mr. Lee was not in custody for the purposes of *Miranda* when he told the officer the bag contained Ecstacy, and therefore, his statement was admissible. Our conclusion is bolstered by the fact his conviction would stand even if we determined Mr. Lee was in "custody" and an "interrogation" occurred when the trooper asked questions about the bag's contents, which he arguably knew would garner an incriminating answer. This is because, prior to Trooper Boumeester's search of Mr. Lee's vehicle, Mr. Lee acknowledged he was responsible for the vehicle's contents. We note the trooper, on finding the bag containing the yellow

and blue tablets with descriptive markings, believed the bag contained Ecstacy, which a subsequent field test verified. Under a harmless error review,[10] it is clear that regardless of Mr. Lee's identification of the tablets as Ecstacy, the trooper's strong belief the bag contained Ecstacy would have led to the same field test which revealed the tablets, for which Mr. Lee had already acknowledged responsibility, were indeed Ecstacy. Thus, even without Mr. Lee's identification of the drug, it is unlikely he could have seriously contested his possession of the drug for which he was convicted.

IV. Conclusion

For the reasons set forth, we **AFFIRM** Mr. Lee's conviction and sentence.

---

[10] We possess a considerable degree of discretion in deciding whether to *sua sponte* apply a harmless error review, and in so doing, consider the length and complexity of the record, whether the harmlessness of the error is certain and debatable, and whether a reversal would result in protracted, costly and futile proceedings in the district court. *See United States v. Samaniego*, 187 F.3d 1222, 1224-26 (10th Cir. 1999). In this case, we exercise our discretion to make such a harmlessness inquiry, noting: 1) Mr. Lee's case is not complex, involving only two criminal counts, a brief suppression hearing, testimony of only two witnesses, and a traffic stop tape which speaks for itself; 2) the outcome of a harmlessness inquiry, if taken, would not be debatable, given the other evidence implicating Mr. Lee; and 3) for the same reasons, reversal to the district court would be futile, given the other evidence clearly incriminating Mr. Lee. Our harmless error review is equivalent or similar to the "inevitable discovery exception" which the government also did not raise as an alternative argument on appeal.

**Entered by the Court:**

**WADE BRORBY**
United States Circuit Judge