DA 07-0478

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2009 MT 242

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

DAVY LEE KENFIELD,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Twelfth Judicial District,
In and For the County of Hill, Cause No. DC 05-149
Honorable John C. McKeon, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

            Jim Wheelis, Chief Appellate Defender; Tammy Hinderman (argued),
Assistant Appellate Defender, Helena, Montana

      For Appellee:

            Hon. Steve Bullock, Montana Attorney General;
Jonathan M. Krauss (argued), Assistant Attorney General;
Helena, Montana

            Cyndee L. Peterson, Hill County Attorney; Havre, Montana

Orally Argued and Submitted:  January 23, 2009

Decided:  July 21, 2009

Filed:

_____
Clerk

Justice W. William Leaphart delivered the Opinion of the Court.

¶1 Davy Lee Kenfield (Kenfield) pleaded guilty in the Twelfth Judicial District Court, Hill County, to criminal production or manufacture of dangerous drugs (one count) and criminal distribution of dangerous drugs to a minor (two counts). Prior to pleading guilty, Kenfield moved to suppress evidence, including statements obtained by officers subsequent to the warrantless entry of his residence. The District Court denied Kenfield's motion to suppress on the basis of the community caretaker doctrine. Kenfield appeals. We affirm the denial of the motion to suppress, but on different grounds than those articulated by the District Court.

¶2 We restate the issue on appeal as follows:

¶3 Did the District Court err when it denied Kenfield's motion to suppress evidence obtained subsequent to the warrantless entry of his residence?

## FACTUAL AND PROCEDURAL BACKGROUND

¶4 On November 23, 2005, a Liberty County dispatcher in Chester, Montana, received an anonymous tip from a caller who said that Kenfield was on his way to Inverness to purchase alcohol for three young people who were allegedly with Kenfield in a pickup truck. The caller identified Kenfield by his first and last name. The three young people were identified as a female by the name of "K,"[1] a male by the name of Michael Morelli (Morelli), and another unknown male whose name the caller did not know. The dispatcher, through a caller identification system, determined that the call had been placed from Morelli's grandmother's residence. The dispatcher relayed the

---

[1] K.H.'s name is abbreviated for purposes of this Opinion pursuant to this Court's privacy rules.

information to Deputy Steve Cameron who was on duty that evening. Deputy Cameron had lived in Liberty County for approximately 38 years and had been a deputy with the Liberty County Sheriff's Department for nine years.

¶5 Upon receiving the information from the dispatcher, Deputy Cameron immediately suspected that the female identified by the anonymous caller was "K.H.," a troubled 15 year old resident of Liberty County. Deputy Cameron suspected K.H. because he knew of no other young person by the name of "K" who lived in Liberty County (population 2,100) or the town of Chester (population 920). Deputy Cameron also suspected K.H. because he had recently issued her a ticket for minor in possession of alcohol and knew her to hang around with Morelli, another young man by the name of Tim Voise (Voise), and another young girl by the name of A.A. Deputy Cameron also knew that Kenfield was approximately 45 years old.

¶6 Deputy Cameron then proceeded from the sheriff's office to K.H.'s grandmother's residence to inquire about the young girl's whereabouts. K.H.'s grandmother told Deputy Cameron that K.H. was with her girlfriend "A.A." Deputy Cameron then told K.H.'s grandmother about the report that K.H. was allegedly in a vehicle with Kenfield on the way to purchase alcohol in Inverness. After hearing who her granddaughter was possibly with and where she was possibly headed, K.H.'s grandmother told Deputy Cameron to pick K.H. up. Deputy Cameron then confirmed that K.H. was not where she told her grandmother she would be that evening by going to A.A.'s residence (and another female's residence suggested by A.A.'s father).

¶7     After leaving A.A.'s residence, Deputy Cameron went back to the sheriff's office in Chester and told the dispatcher to notify Hill County that he needed to go to Inverness to look for K.H. Deputy Cameron knew that Kenfield lived in Inverness, which is located approximately 14 miles east of Chester because he knew that a colleague, Undersheriff Dave Riggin, had recently responded to a weapons complaint at Kenfield's residence. Deputy Cameron also knew that Kenfield had been investigated for stealing ladies' underwear from the local high school approximately 20 years earlier. Deputy Cameron received permission to enter Hill County but did not request assistance or backup at that time.

¶8     Before heading to Inverness, Deputy Cameron stopped to get directions to Kenfield's residence from Undersheriff Riggin. In addition to the directions, Undersheriff Riggin told Deputy Cameron that Kenfield had a penchant for hanging around with young people and that he had picked up another young girl from Kenfield's residence a couple of years earlier without incident. Deputy Cameron then proceeded towards Kenfield's residence in Inverness. While en route, Deputy Cameron learned that the repeater channel was down, which meant that he had no means of communicating with anyone once he was outside of Chester. Deputy Cameron did not stop to inform the dispatcher or otherwise notify anyone about the problem.

¶9     When Deputy Cameron arrived at Kenfield's trailer, he immediately recognized Voise's pickup truck and recorded the license plate numbers. Deputy Cameron also heard loud music and voices coming from the residence and could tell that the lights in the trailer were on, although the windows were heavily curtained. Deputy Cameron

4

approached the trailer, opened the screen door, and noticed the "faint smell of marijuana." Deputy Cameron then knocked on the outside steel door and identified himself as the Sheriff's Department. At this point, the music went off, the lights went out, and Deputy Cameron heard the sound of running feet. After waiting approximately 8-10 seconds, Deputy Cameron entered the trailer, first through the screen and steel doors, and then through another interior door, which opened into the trailer's main living space.

¶10 Upon entering the trailer, Officer Cameron was confronted with the "overwhelming" odor of marijuana and saw Voise sitting at the kitchen table. He then saw someone run down the hall into a back room and slam the door. Deputy Cameron opened the door and saw Kenfield standing in the room. Kenfield asked Deputy Cameron what he was doing in his house. Deputy Cameron explained that he was looking for K.H. In response, Kenfield said that K.H. was "out there." After gathering everyone into the kitchen, Deputy Cameron noticed that Morelli was not present and left the group in the kitchen to look for him. When he returned to the kitchen, Deputy Cameron saw Kenfield washing his hands and noticed marijuana paraphernalia and residue on the kitchen stove next to Kenfield. Concerned that Kenfield was trying to destroy evidence, Deputy Cameron placed Kenfield in handcuffs and called dispatch from the trailer to request assistance. Deputy Cameron then gave Miranda warnings to Kenfield, K.H., Morelli, and Voise.

¶11 After Hill County deputies arrived, they seized contraband on the stove and two open grocery bags filled with marijuana in the living room. The deputies asked Kenfield

5

for permission to search his residence, but he refused. The Federal Bureau of Investigation (FBI) was called and a search warrant for the premises was subsequently obtained. Ultimately officers seized a variety of marijuana related items, such as potting soil and marijuana leaves and stems. They also seized a video camera and three tapes from a cupboard, two rifles and a shotgun, a box of documents with telephone numbers, pornographic magazines, grow lights, and marijuana plants. The tapes evidently showed young girls, unaware that they were being filmed, using his bathroom in the trailer. The tapes also showed Kenfield supplying people with marijuana at his residence. Kenfield was charged by Information with the following offenses: Criminal Production or Manufacture of Dangerous Drugs; Criminal Distribution of Dangerous Drugs to a Minor (two counts); and Sexual Abuse of Children (three counts).[2]

¶12 On April 27, 2006, Kenfield filed a motion to suppress the evidence obtained by officers following the warrantless entry of his residence, including various statements Kenfield made to the officers and evidence obtained pursuant to the subsequently obtained search warrant. Kenfield claimed the entry into his residence was illegal and could not be justified by any exception to the warrant requirement. In response, the State claimed the entry was justified under the community caretaker doctrine and that Deputy Cameron had a reasonable belief that K.H. was in need of help or in peril, and that this suspicion justified the warrantless entry and search of Kenfield's residence.

---

[2] Kenfield was also convicted and sentenced in federal court for receipt and possession of child pornography under 18 U.S.C. §§ 2252A(a)(2), (a)(5)(B).

¶13 A hearing on Kenfield's motion to suppress was conducted on May 31, 2006. During the hearing, Deputy Cameron stated that at the time he entered Kenfield's residence he was very concerned about K.H. and that he was sure K.H. was in the residence "because of the vehicle and the people she's hanging out with." Deputy Cameron also said the following: "I have no radio contact. I have no phone. I can't call for backup. I can't try to get a warrant. I can't try to do anything. I was concerned for [K.H.'s] safe[t]y." The District Court concluded that the community caretaker doctrine justified the warrantless entry of Kenfield's residence and denied the motion to suppress.

¶14 Kenfield pleaded guilty to criminal production or manufacture of dangerous drugs (one count) and to criminal distribution of dangerous drugs to a minor (two counts). In exchange, the State agreed to dismiss the sexual abuse of children charges. Kenfield was sentenced to a total of 15 years to the Department of Corrections, with all but two years suspended. The sentences imposed were ordered to run concurrent with Kenfield's federal sentence, which stemmed from the same incident. Kenfield appeals.

## STANDARD OF REVIEW

¶15 We review a district court's denial of a motion to suppress to determine whether its findings of fact are clearly erroneous and whether its interpretation and application of the law is correct. *State v. Wheeler*, 2006 MT 38, ¶ 12, 331 Mont. 179, 134 P.3d 38. Findings of fact are clearly erroneous if they are not supported by substantial evidence, the court misapprehended the effect of the evidence, or if our review of the record convinces us that a mistake has been made. *Wheeler*, ¶ 12. Further, we review a district

court's conclusions of law with respect to the application of the community caretaker doctrine to determine if they are correct. *Wheeler*, ¶ 12.

## DISCUSSION

¶16 Kenfield claims the District Court erred by denying his motion to suppress evidence obtained subsequent to the warrantless entry of his residence, including various statements he made to officers following the entry. Specifically, Kenfield argues that the District Court erred by applying the community caretaker doctrine to justify the warrantless intrusion. Instead, Kenfield claims that the District Court should have applied the test for the exigent circumstances exception to the warrant requirement; a test which he also claims cannot be satisfied. Although the District Court relied on the community caretaker doctrine, we conclude that there were exigent circumstances and thus, we need not address the community caretaker doctrine. We will, however, affirm a court's decision if it reaches the correct result, albeit for the wrong reason. *See State v. Dickinson*, 2008 MT 159, ¶ 29, 343 Mont. 301, 184 P.3d 305.

¶17 The Fourth Amendment of the United States Constitution and Article II, Section 11 of the Montana Constitution protect citizens from unreasonable searches and seizures. It is well-settled that warrantless searches and seizures conducted inside a home are *per se* unreasonable, subject to a few carefully drawn exceptions. *State v. Wakeford*, 1998 MT 16, ¶ 21, 287 Mont. 220, 953 P.2d 1065. The exigent circumstances exception is a recognized exception to the warrant requirement and provides that a "warrantless entry by law enforcement officials may be legal when there is a compelling need for official action and no time to secure a warrant." *Wakeford*, ¶ 23 (citing *Michigan v. Tyler*, 436

8

U.S. 499, 509, 98 S. Ct. 1942, 1949 (1978). In order to establish the exigent circumstances exception, the state must demonstrate the existence of both probable cause and exigent circumstances. *Wakeford*, ¶ 22. Accordingly, we first turn to a discussion of whether probable cause has been established.

¶18 Probable cause exists when "the facts and circumstances within the officer's personal knowledge, or imparted to the officer by a reliable source, are sufficient to warrant a reasonable person to believe that the suspect has committed an offense." *Wakeford*, ¶ 22. Further, "probable cause is evaluated in the light of a police officer's knowledge, and all the relevant circumstances." *State v. Van Dort*, 2003 MT 104, ¶ 19, 315 Mont. 303, 68 P.3d 728.

¶19 Kenfield claims that Deputy Cameron did not have "probable cause to believe any crime, let alone a sexual offense, had occurred or was occurring." In support of his argument, Kenfield cites testimony from Deputy Cameron provided at the hearing on the motion to suppress in which he stated that he "didn't know what was going on" and that he could not "describe everything involved in it." Kenfield claims that no reasonable person would believe that he was sexually assaulting K.H. or holding her against her will on the basis of the evidence available to Deputy Cameron. Kenfield also notes that the faint smell of marijuana noticed by Deputy Cameron prior to the entry did not, in and of itself, support a finding of probable cause.

¶20 Kenfield ignores, however, that the odor of marijuana coupled with additional facts and circumstances may establish probable cause. *See State v. Morse*, 2006 MT 54, ¶¶ 17-18, 331 Mont. 300, 132 P.3d 528 (concluding that other facts in addition to the

9

odor of marijuana contributes to a determination of probable cause). Here, it is undisputed that Deputy Cameron noticed the odor of marijuana upon approaching the trailer. Further, after hearing an officer announce his presence, the occupants of the trailer did not come to the door or otherwise attempt to communicate with Deputy Cameron. Instead, the occupants immediately turned off the music and lights and attempted to evade law enforcement. These facts, when combined with the additional evidence Deputy Cameron possessed prior to the entry, including that Kenfield was headed to Inverness to purchase alcohol for an underage minor, were sufficient for the officer to form a reasonable belief that Kenfield had committed or was committing an offense. (See § 45-5-623(b), MCA, (stating that it is unlawful to sell or give intoxicating substances to a child under the age of majority); see also § 45-5-623(c), MCA, (stating that it is unlawful for a person to sell or give an alcoholic beverage to a person under the age of 21).) Based on the foregoing, we conclude that Deputy Cameron had probable cause to believe that Kenfield had committed an offense.

¶21 This case is distinguishable from our decision in *State v. McBride*, 1999 MT 127, 294 Mont. 461, 982 P.2d 453, wherein we concluded that probable cause and thus, the exigent circumstances exception, could not be established. In *McBride*, a father of a sixteen-year-old runaway, A.H., reported to police that he had received a phone call from A.H. and that the call at been placed from the defendant's residence. A.H.'s father also told police that A.H. was in violation of her probation and asked the officers to respond to the location. When officers arrived at the defendant's residence, there were no signs of ongoing criminal activity. Further, when the officers knocked on the door, no one

10

responded. After a second knock, which caused the door to open slightly, the defendant attempted to shut the door. The officer pushed back on the door and the door swung open. With the door open, the officer could see the defendant, who appeared to be under the age of 21, holding a beer. The defendant then refused the officer's request to enter and talk. Nevertheless, the officer entered the residence and discovered A.H. sitting in the living room. The defendant was cited for minor in possession of alcohol and was arrested on an outstanding warrant. Officers also subsequently discovered methamphetamine in the defendant's pocket. The defendant moved to suppress the evidence seized and statements he made to officers following the entry. The district court denied the motion.

¶22 In *McBride*, we concluded that the facts and circumstances were not sufficient to establish probable cause. There was no evidence at the time of the entry that the defendant had committed an offense or that a crime was being committed at the residence. We also noted that the girl's father had no reason to believe that the defendant (or any one else in the residence) "had caused his daughter to be absent from home." *McBride*, ¶ 14.

¶23 Here, in contrast, Deputy Cameron was aware of facts and circumstances that were sufficient for an experienced officer to believe that a crime had been committed or was occurring. Specifically, Deputy Cameron noticed the smell of drugs upon approaching the trailer. He was also confronted with the sound of running feet and the lights and music going off after he knocked on the door and announced his presence. In addition, Deputy Cameron had received a report that a young girl (who he believed to be K.H.)

11

was out with at least three older men and that they planned to purchase alcohol. He also knew that Kenfield, one of the men specifically mentioned in the report, was at least 30 years older than K.H. and had a reputation for hanging out with people much younger than he, including young girls. Additionally, Deputy Cameron knew that officers had previously responded to a weapons complaint at Kenfield's residence. These facts, taken together, are much more substantive and compelling than those in *McBride*, where the officers did not know the defendant or any of the people involved, where there was no factual, observable evidence that a crime had been committed, and where there was no attempt by the occupants to flee the scene.

¶24 We turn next to a discussion of whether exigent circumstances were present. Exigent circumstances are "those circumstances that would cause a reasonable person to believe that entry (or other relevant prompt action) was necessary to prevent physical harm to the officers or other persons, the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *Wakeford*, ¶ 24. We have stated that "exigent circumstances for conducting a warrantless search exist, 'where it is not practicable to secure a warrant.'" *State v. Gomez*, 2007 MT 111, ¶ 27, 337 Mont. 219, 1158 P.3d 442 (citing *State v. Bassett*, 1999 MT 109, ¶ 47, 294 Mont. 327, 982 P.2d 410. We have also stated that the state "bears the heavy burden of showing the existence of exigent circumstances." *Wakeford*, ¶ 24.

¶25 Kenfield argues that Deputy Cameron could not have believed that K.H. was in need of immediate assistance given that he did not race to Kenfield's residence with his

lights on, nor did he stop to request backup when he realized that his radio was not working or stop to call "his dispatcher or the local authorities." Kenfield also notes that Deputy Cameron stopped to write down the license plates numbers of the vehicles parked in front of the trailer when he arrived, apparently insinuating that Deputy Cameron was not sufficiently concerned about K.H.'s well-being to justify the warrantless intrusion.

¶26    We do not agree.  Given the remote location of Inverness, the time of the incident, the failure of the communication channel, and the response to the knock and announce, it was not practicable for Deputy Cameron to secure a warrant prior to the entry of Kenfield's residence.  At the hearing on the motion to suppress, Deputy Cameron expressed his concern about the circumstances; he said, "I have no radio contact.  I have no phone.  I can't call for backup.  I can't try to get a warrant.  I can't try to do anything. I was concerned for [K.H.'s] safe[t]y."  Inverness is an isolated community with no local police presence, and the failure of the communication channel left Deputy Cameron in a position where he had to decide whether to proceed into the residence or risk delaying entry and possibly exposing K.H. to further harm.  Deputy Cameron also had evidence that drugs were being used in the residence.  Leaving the scene to find assistance would have given the occupants an opportunity to destroy any drug related evidence.  Based on the response to his knock on the door, Deputy Cameron specifically stated that he believed the occupants of the residence were attempting to hide marijuana when they reacted by turning off the music and lights and ran instead of coming to the door.  As noted above, the belief that relevant evidence is being destroyed supports the existence of exigent circumstances.  These circumstances in conjunction with all of the information

13

Deputy Cameron possessed about K.H. and Kenfield prior to the entry would cause a reasonable person to believe that an immediate entry of Kenfield's residence was necessary. Accordingly, we conclude that exigent circumstances were present. Because probable cause and exigent circumstances existed, we also conclude that Deputy Cameron's entry into Kenfield's residence was justified under the exigent circumstances exception to the warrant requirement. Finally, since Deputy Cameron was lawfully in the residence pursuant to the exigent circumstances exception, his observation of the marijuana residue and paraphernalia was also lawful and admissible under the plain view doctrine, which "allows peace officers, under certain circumstances, to seize evidence in plain view without a warrant." *State v. Lewis*, 2007 MT 295, ¶ 22, 340 Mont. 10, 171 P.3d 731.

## CONCLUSION

¶27 For these reasons, we affirm the District Court's order denying Kenfield's motion to suppress evidence obtained by officers following the warrantless entry of his residence.

/S/ W. WILLIAM LEAPHART

We concur:

/S/ PATRICIA COTTER
/S/ JIM RICE
/S/ JOHN WARNER
/S/ BRIAN MORRIS
/S/ JAMES C. NELSON
/S/ BRAD NEWMAN
District Court Judge Brad Newman
sitting in for Chief Justice Mike McGrath

14