FILED

01/05/2021

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 19-0026

DA 19-0026

IN THE SUPREME COURT OF THE STATE OF MONTANA

2021 MT 6N

STATE OF MONTANA,

      Plaintiff and Appellee,

  v.

THOMAS JOSEPH MAHAN,

      Defendant and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DC 18-0876
Honorable Gregory R. Todd, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Appellate Defender, Kathryn Hutchison, Assistant
Appellate Defender, Helena, Montana

      For Appellee:

          Austin Knudsen, Montana Attorney General, Jonathan Bennion,
Chief Deputy Attorney General, Helena, Montana

          Scott D. Twito, Yellowstone County Attorney, Billings, Montana

Submitted on Briefs:  December 9, 2020

Decided:  January 5, 2021

Filed:

_____
Clerk

Chief Justice Mike McGrath delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, this case is decided by memorandum opinion and shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in this Court's quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 Thomas Joseph Mahan (Mahan) appeals from a November 13, 2018 Thirteenth Judicial District Court for Yellowstone County decision affirming his June 12, 2018 Justice Court conviction of misdemeanor Driving Under the Influence of Alcohol pursuant to § 61-8-401(1)(a), MCA. We affirm.

¶3 Around 1:00 a.m. on August 4, 2017, Deputy Aaron Harris (Harris) of the Yellowstone County Sheriff's Office was parked in a closed-down gas station on Highway 87 East in Billings when a tow-truck driver pulled up to Harris's vehicle and related that a gray pickup truck was parked in the middle of Cerise Road with the driver apparently passed out. At its closest, Cerise Road is about half a mile's drive from where Harris was parked. The tow truck driver provided his name and contact information to Harris and, referring to the driver of the gray pickup truck, stated, "I don't know if he needs help, or . . . ." Harris responded, "Okay, I'll go check on him."

¶4 Harris was on the phone with another deputy and, as he pulled out of the lot and proceeded towards Cerise Road, requested that the other officer also drive toward Cerise Road. About 20 seconds later, a gray pickup truck, driven by Mahan, passed Harris going in the opposite direction. Harris turned around and followed this vehicle, which soon came

2

to a stop at a red light. Harris radioed the license plate information to dispatch. Harris testified that he observed a liquid running down the truck's rear bumper which was later determined to be vomit.

¶5 When the stoplight turned green, the truck made a left turn. Harris testified that the vehicle accelerated rapidly and crossed the fog line, or painted lane markers, and appeared to be weaving before approaching another traffic light. In the video recording from Harris's dash cam, the truck can be heard accelerating as it leaves the camera's field of view for several seconds before Harris's vehicle also completes the left turn and brings the truck back into frame as it approaches the next traffic light. While visible in the frame, Mahan does not cross the dashed line dividing lanes or the fog line, which closely abuts a curb, or appear to be weaving.

¶6 Mahan then made another left turn at the green traffic light, entering an interstate entrance ramp. Harris testified that the Mahan accelerated rapidly up the entrance ramp and appeared to be weaving within his lane and crossing the painted lane marker several times. Mahan is outside of the frame of Harris's dashboard camera for approximately five seconds after making the left turn. When Harris completes the turn and brings the truck back into the camera's view, Mahan can be seen proceeding up the entrance ramp without crossing lane markers or noticeably weaving. Once on the interstate, the video shows Harris close the distance to Mahan's truck.

¶7 The speed limit on this section of highway is 65 miles per hour. Harris testified that, using both his speedometer and his radar, he "paced" Mahan's truck traveling at 74 miles per hour. He then clarified that he does not have same direction radar capability

and that he essentially uses the radar to verify the accuracy of his own speedometer. Harris's dashboard camera is an Arbitrator system that can use GPS to calculate the speed of Harris's vehicle and display it on the video playback. The recorded video shows Harris close the gap to Mahan's truck over the course of approximately 26 seconds after leaving the intersection, then follow the truck closely for approximately seven or eight seconds before activating his emergency lights. The Arbitrator video system displays no speed readouts between when Harris merged onto the interstate—when it shows 51 miles per hour—and when he activates his emergency lights, approximately 20 seconds later. At that point, the Arbitrator recording system displays Harris's speed as 70 miles per hour.

¶8 As he approached Mahan's truck, Harris stated, "The reason I'm stopping you is this is a 65 in here. I just paced you going 74." The traffic stop eventually led to Mahan's arrest for driving under the influence of alcohol. It is undisputed that Mahan's truck was not the same truck with the passed- out driver on Cerise Road that was reported by the tow truck driver.

¶9 Mahan was charged in Yellowstone County with the misdemeanor of Driving Under the Influence of Alcohol, First Offense, in violation of § 61-8-401(1)(a), MCA. The Yellowstone County Justice Court denied Mahan's motion to exclude the evidence obtained from the stop, determining that Harris had a sufficiently particularized suspicion to justify the stop. The Justice Court's conclusion rested on its determination that Harris had corroborated the tow-truck driver's report by finding Mahan's truck "substantially as described" and through his testimony that he had observed the vomit-adorned truck make unusually rapid accelerations, weave across lane markers, and speed. After a jury trial,

4

Mahan was found guilty of misdemeanor Driving a Motor Vehicle Under the Influence of Alcohol. The District Court affirmed, determining that Harris was justified in conducting a traffic stop on the basis of Mahan's alleged speeding.

¶10 This Court reviews lower court rulings that are appealed to a district court de novo, as if the appeal had originally been filed with this Court. *State v. Ellison*, 2012 MT 50, ¶ 8, 364 Mont. 276, 272 P.3d 646; *State v. Akers*, 2017 MT 311, ¶ 9, 389 Mont. 531, 408 P.3d 142. When reviewing rulings on a motion to suppress, we determine whether the lower court's factual findings were clearly erroneous and whether the interpretation and application of law was correct. *State v. Wilson*, 2018 MT 268, ¶ 21, 393 Mont. 238, 430 P.3d 77 (citation omitted). A lower court's finding of the existence of particularized suspicion is a question of fact. *City of Missoula v. Moore*, 2011 MT 61, ¶ 10, 360 Mont. 22, 251 P.3d 679. A finding is clearly erroneous if it is not supported by substantial evidence, the court misapprehended the effect of the evidence, or the review of the record leaves the Court with a firm conviction that a mistake has been made. *State v. Kenfield*, 2009 MT 242, ¶ 15, 351 Mont. 409, 213 P.3d 461.

¶11 On appeal, Mahan argues the Justice Court erred in finding that Harris's stop was justified by a particularized suspicion from a citizen complaint corroborated by either observing illegal activity or by finding Mahan's vehicle substantially as described by the tow truck driver. Mahan points to the lack of distinctive identifying features capable of corroboration beyond the existence of a gray truck in the area, notes that the vomit was not positively identified until after the stop and that Harris's claims that Mahan was weaving or crossing the fog line are unsupported by the video recording, argues that his rate of

acceleration was neither unlawful nor suspicious, and claims that the Justice Court misapprehended the evidence regarding whether he was speeding. The State counters that Harris had sufficient information to reasonably believe that Mahan was either speeding or, alternatively, driving under the influence of alcohol as suggested by the tow truck driver.

¶12 Montanans are entitled to be free from unreasonable searches and seizures by the constitutions of both Montana and the United States. U.S. Const. amend. IV; Mont. Const. art. II, § 11. An officer may stop an individual for a limited investigation when circumstances create a "particularized suspicion" that the person is or has been engaged in the commission of a crime. *State v. Hurlbert*, 2009 MT 221, ¶ 20, 351 Mont. 316, 211 P.3d 869 (citations omitted). An officer's particularized suspicion arises from the totality of the circumstances, looking at "objective data and articulable facts." *Moore*, ¶ 16. A court will review the existence of particularized suspicion in light of the quantity, content, quality, and reliability of that information. *Moore*, ¶ 16; *City of Missoula v. Metz*, 2019 MT 264, ¶ 19, 397 Mont. 467, 451 P.3d 530. Commission of a traffic violation can justify a traffic stop. *See State v. Farabee*, 2000 MT 265, ¶ 19, 302 Mont. 29, 22 P.3d 175 (holding that officers had particularized suspicion justifying traffic stop based on observation that right headlight was missing); *State v. Zimmerman*, 2018 MT 94, ¶ 15, 391 Mont. 210, 417 P.3d 289. However, a mere "possible traffic violation" alone is insufficient for particularized suspicion. *State v. Reynolds*, 272 Mont. 46, 51, 899 P.2d 540, 543 (1995).

¶13 The District Court found that Harris had reasonable suspicion that Mahan was driving at a rate in excess of the local maximum of 65 miles per hour, thereby justifying

6

the traffic stop. Essentially, Harris's testimony was that he used his speedometer and radar gun to determine that Harris's vehicle was moving at 74 miles per hour while following Mahan, thereby inferring that Mahan was traveling at a similar speed. Mahan argues that this inference is broken by Harris's testimony that he had to catch up with Mahan after Mahan's more rapid acceleration up the interstate entrance.

¶14 While the dashboard video does show Harris closing the gap between himself and Mahan until approximately 26 seconds after leaving the second traffic light, it then shows Harris following Mahan at a steady distance for seven or eight seconds prior to activating his emergency lights. Harris was therefore traveling at the same speed as Mahan for a span of time during which he could have accurately "paced" Mahan using his own vehicle's speed. In the recorded video, Harris is still following closely behind Mahan at a steady distance as the display system flashes Harris's GPS-calculated speed of 70 miles per hour, corroborating Harris's testimony that Mahan was travelling over the posted speed limit of 65 miles per hour.

¶15 The Justice Court's factual conclusion that Harris observed Mahan conducting "illegal activity," i.e., speeding, is supported by substantial evidence and therefore not clearly erroneous. The speed of Harris's and Mahan's vehicles indicated more than a mere "possible" traffic violation and underlies the necessary particularized suspicion that Mahan was violating a speed restriction, thereby justifying the traffic stop. *Cf. Reynolds*, 272 Mont. at 51, 899 P.2d at 543 (finding officer testimony that vehicle was "bordering on traveling too fast" as it passed through an intersection was a mere "possible" traffic violation insufficient to support particularized suspicion).

7

¶16 Though Mahan argues that the traffic stop on the basis of speeding was a mere pretext, the recorded video suggests otherwise by showing Harris immediately informing Mahan that the primary reason he was being pulled over was for traveling 74 miles per hour in a 65 mile per hour speed zone. Because we find that the traffic stop was justified by reasonable suspicion that Harris was speeding, we need not address the alternative argument of whether Harris had a reasonable suspicion that Mahan was the driver of the gray truck on Cerise Road and was driving under the influence of alcohol.

¶17 We have determined to decide this case pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules, which provides for memorandum opinions. In the opinion of the Court, the case presents a question controlled by settled law or by the clear application of applicable standards of review.

¶18 Affirmed.

/S/ MIKE McGRATH

We Concur:

/S/ JAMES JEREMIAH SHEA
/S/ DIRK M. SANDEFUR
/S/ BETH BAKER
/S/ JIM RICE