JUSTICE NELSON,
concurring and dissenting.
¶36 I concur with the Court’s decision in Issue 1. However, I dissent from the Court’s decision in Issue 2 that the inevitable discovery doctrine justifies the admission of the evidence obtained from the second search of Pearson’s fanny pack. In my view, the Court has incorrectly applied the inevitable discovery doctrine to the facts in this case.
¶37 The District Court concluded, and this Court agreed, that although the officers exceeded their authority when they searched Pearson’s fanny pack for a second time, the evidence was admissible. The District Court reasoned that the testimony of Officer Pinnick, Pearson’s probation officer, that he would have authorized a search of Pearson’s fanny pack had he been asked, rendered the evidence admissible via the inevitable discovery doctrine. However, under this Court’s precedent, such a post-search authorization does not overcome the illegality of the search.
¶38 The District Court also reasoned that the evidence would inevitably have been discovered during an inventory search at the detention facility when Pearson was transported there at Officer Pinnick’s direction for a probation violation based on possession of the *436 pepper spray. However, this presupposes that the officers had decided to arrest Pearson and transport him to the detention facility even before they searched the fanny pack for the second time. The facts in this case do not support that conclusion.
¶39 Warrantless searches, as in the instant case, are considered per se unreasonable unless an exception to the warrant requirement applies. State v. Dickinson, 2008 MT 159, ¶ 18, 343 Mont. 301, 184 P.3d 305 (citing State v. Ruggirello, 2008 MT 8, ¶ 17, 341 Mont. 88, 176 P.3d 252). Where no exception exists, the exclusionary rule bars the admission at trial of evidence obtained as a result of an unconstitutional search or seizure. State v. Ellis, 2009 MT 192, ¶ 48, 351 Mont. 95, 210 P.3d 144. The primary purpose of the exclusionary rule is to deter illegal police conduct and to preserve judicial integrity. Ellis, ¶ 48.
¶40 The inevitable discovery doctrine is an exception to the exclusionary rule. Ellis, ¶ 48 (citing Dickinson, ¶ 19). It allows the introduction of illegally obtained evidence where the government proves by a preponderance of the evidence that the tainted evidence would inevitably have been discovered through lawful means. Ellis, ¶ 49 (citing United States v. Mejia, 69 F.3d 309, 319 (9th Cir. 1995)). However, we have held that evidence which comes to light as a result of the exploitation of an initial illegal act of the police cannot be justified under the inevitable discovery doctrine. State v. Therriault, 2000 MT 286, ¶ 57-60, 302 Mont. 189, 14 P.3d 444.

Search authorized by probation officer

¶41 While we have held that a search of a probationer’s effects may be conducted without a search warrant, we have also held that the search must be authorized by the probation officer. See State v. Meza, 2006 MT 210, ¶ 29, 333 Mont. 305, 143 P.3d 422 (“As a general matter, searches of parolees conducted by police officers are permissible with the consent of the parole officer.” (emphasis added)); see also State v. Boston, 269 Mont. 300, 305, 889 P.2d 814, 817 (1994); State v. Burke, 235 Mont. 165, 766 P.2d 254 (1988); State v. Burchett, 277 Mont. 192, 921 P.2d 854 (1996). “ ‘[T]he probation officer must be able to supervise the probationer [or parolee], and upon his judgment and expertise, search the probationer’s [or parolee’s] residence or cause it to be searched.’ ” Boston, 269 Mont, at 305, 889 P.2d at 817 (emphasis added) (quoting Burke, 235 Mont. at 171, 766 P.2d at 257).
¶42 In this case, the officers had every opportunity to call Officer Pinnick before initiating the second search of the fanny pack. Their failure to secure Officer Pinnick’s authorization prior to the second *437 search of the fanny pack cannot be justified after the fact by the inevitable discovery doctrine. Such an after-the-fact authorization from a probation officer is similar to the after-the-fact consent to search we held improper in Ellis.
¶43 In that case, law enforcement officers had the victim fill out a form giving officers permission to search her father’s residence after the officers had already searched it and seized various items. Ellis, ¶ 45. We stated in that case that this after-the-fact consent was ineffective because “ ‘to be valid and qualify as an exception to the warrant requirement, a consent must precede a search.’ ” Ellis, ¶ 45 (quoting State v. Hubbel, 286 Mont. 200, 216, 951 P.2d 971, 980 (1997), overruled on other grounds by State v. Hendricks, 2003 MT 223, 317 Mont. 177, 75 P.3d 1268). We further stated that “ ‘to be lawful, a search and seizure must be justified from the beginning.’ ” Ellis, ¶ 45 (quoting Hubbel, 286 Mont. at 216, 951 P.2d at 981); see also Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868 (1968).
¶44 Inevitable discovery applies when the investigatory procedures were already in progress prior to the illegal search. Ellis, ¶ 55 (citing Nix v. Williams, 467 U.S. 431, 104 S. Ct. 2501 (1984) (two hundred volunteers were already searching the area where the defendant had abandoned his victim’s body before the defendant gave an illegally obtained statement about the exact location of the body); State v. Adkins, 2009 MT 71, 349 Mont. 444, 204 P.3d 1 (imminent probation search of residence inevitably would have led to discovery of drugs); State v. Lacey, 2009 MT 62, 349 Mont. 371, 204 P.3d 1192 (defendant’s computer containing images of defendant sexually abusing his girlfriend’s minor daughter was not searched based on girlfriend’s consent, but pursuant to a federal search warrant); Dickinson, ¶¶ 3-7 (upon speaking with the occupants of a hotel room on another matter, officers observed through the open door the presence of weapons; the officers first secured the room and the weapons before applying for a search warrant); State v. Notti, 2003 MT 170, 316 Mont. 345, 71 P.3d 1233 (multiple DNA databases matching the defendant to another crime were already established before the search)).
¶45 Here, the evidence seized from Pearson’s fanny pack was not the inevitable product of a legal probationary search already in progress. The District Court’s reasoning to the contrary assumes a post-search authorization can cure the illegality of the search, but the inevitable discovery doctrine is not meant to justify law enforcement’s decision to not follow proper procedure.
¶46 The State argues here that it would have searched the fanny pack *438 legally had they not already searched it illegally. We stated in Ellis that “[a]llowing the introduction of evidence under the inevitable discovery doctrine in this case would ‘amount to the unacceptable assertion that police would have done it right had they not done it wrong.’ ” Ellis, ¶ 57 (quoting State v. Davolt, 84 P.3d 456, 469 (Ariz. 2004)); see also State v. Topanotes, 76 P.3d 1159, 1164 (Utah 2003) (“the argument that ‘if we hadn’t done it wrong, we would have done it right’... is far from compelling”) (quoting United States v. Thomas, 955 F.2d 207, 210 (4th Cir. 1992)).

Inventory search at detention facility

¶47 Nor can the admission of the evidence in this case be justified on the basis that the fanny pack would have been searched at the detention facility in any event. This argument relies on the assumption that Pearson would have been detained for the pepper spray violation alone. However, Officer Pinnick did not testify that he would have authorized a probation hold absent the drug evidence. Rather, he testified that he would have authorized a search of Pearson’s vehicle and fanny pack had the officers contacted him after observing the pepper spray.
¶48 The actual record in this case belies the Court’s decision. After Officer Kristjanson observed the pepper spray in Pearson’s vehicle, Pearson was handcuffed and placed in the back of the patrol car so that the officers would be free to search his vehicle. The testimony presented at the hearing on Pearson’s motion to suppress indicates that Pearson had not been placed under arrest at that point; he simply was being detained while all four officers at the scene searched his vehicle. In fact, Officer Kristjanson testified that Pearson was not read his Miranda rights at that time.
¶49 It was not until after the fanny pack was searched for the second time and the officers found the bindle of methamphetamine that they decided to arrest Pearson and take him to the detention facility. Notably, Officer Kristjanson testified to the following when questioned by the Judge:
Q: I think you testified that you intended to take the defendant to jail for the probation violation, that being the pepper spray; is that correct?
A: Yes, Your Honor.
Q: Do you ever do that without talking to the probation officer first?
A: Never, Your Honor.
Q: So at the time on the video that you’re placing the defendant *439 in handcuffs, you’re detaining him for what you believe to be a probation violation?
A: Yes, Your Honor.
Q: And that’s the pepper spray?
A: Yes, Your Honor.
Q: But you would not actually transport him until you talked to the probation officer?
A: Correct. [Emphasis added.]
And, Officer Pinnick testified to the following when questioned by defense counsel:
Q: Probation Officer Pinnick, when you were called by Officer Kristjanson, it’s your understanding that the search of the vehicle and the fanny-pack had already occurred?
A: That’s correct.
Q: Okay. So the information that was presented to you is that the officers had found methamphetamine in the defendant’s fanny-pack; is that correct?
A: Correct.
Q: And so you made the consideration as to whether the officers should hold the defendant for a probation violation based on the methamphetamine and the pepper spray; is that correct?
A: Both, yes. [Emphasis added.]
¶50 It is clear from Officer Kristjanson’s testimony that Pearson would not have been transported to the detention facility without Officer Pinnick’s authorization. It is also clear from Officer Pinnick’s testimony that he only authorized the probation violation hold of Pearson on the discovery of both the pepper spray and the methamphetamine. Consequently, it was not “inevitable” that the evidence would have been discovered during an inventory search at the detention facility because it was not until after the methamphetamine was discovered that the decision was made to transport Pearson to the detention facility. Thus, the methamphetamine evidence was inadmissible because it was the product of an illegal warrantless search.
¶51 In addition, the Court points out that Officer Kristjanson testified that he had intended to detain and arrest Pearson based solely on the pepper spray violation. Opinion, ¶ 27. While that may or may not be the case, Officer Kristjanson did not arrest Pearson until after the discovery of the methamphetamine. The patrol car’s video cam shows that several minutes after the officers searched Pearson’s fanny pack for the second time, one of the officers returned to the patrol car to give *440 Pearson the cash Pearson left in his vehicle. While the events taking place inside the patrol car are not visible on the video, the audio portion clearly indicates that after counting out the cash in front of Pearson, the officer stated: “At this time you’re being placed under arrest for possession of drug paraphernalia, criminal possession of dangerous drugs-methamphetamine, and a probation violation.”
¶52 As already pointed out in this Concurrence and Dissent, the inevitable discovery doctrine allows the introduction of illegally obtained evidence where the government proves by a preponderance of the evidence that the tainted evidence would inevitably have been discovered through lawful means. Ellis, ¶ 49. The State has not made the requisite showing in this case. In fact, the evidence is to the contrary.
¶53 The Court continues to emphasize Officer Kristjanson’s testimony that he would have taken Pearson to the detention facility based solely on the discovery of the pepper spray. Opinion, ¶ 29. But the conduct of all of the officers is totally inconsistent with that testimony. If the pepper spray alone was enough in the officers’ opinion to justify Pearson’s arrest, why bother to enlist additional officers to search Pearson’s vehicle? Why not just arrest Pearson for the probation violation and take him to jail? Why bother to solicit Pearson’s consent to search his vehicle unless the officers felt they did not yet have 9 enough evidence to arrest him? And why, if they had already decided to arrest Pearson after finding the pepper spray, did they wait so long to read him his Miranda rights?
¶54 Furthermore, the Court states that after Officer Kristjanson placed Pearson in the patrol car in handcuffs, Officer Kristjanson attempted to contact Officer Pinnick “to gain permission to transport” I Pearson. Opinion, ¶ 27. Why, if Officer Kristjanson intended to arrest 1 Pearson anyway, did he need the permission of Pearson’s probation I officer to transport Pearson to jail? I
¶55 In short, the actual record demonstrates that the 1 methamphetamine was seized as the result of an unauthorized, and 1 therefore, illegal, probation search. Officer Pinnick was not contacted 1 until after the unauthorized search, and it is clear from his testimony 9 that Pearson’s detention was premised on the discovery of both the 9 pepper spray and the methamphetamine. The record reflects that, H based on the pepper spray alone, Pearson would not have been 9 detained. In fact, Officer Kristjanson testified that he would never take I a defendant to jail without talking to the probation officer first, fl Therefore, there would not have been an inventory search. The actual 1 *441 record plainly refutes the Court’s determination to affirm the trial court.
¶56 Based on the foregoing, I would reverse the District Court on Issue 2, and I dissent from our failure to do so.